GENERAL ATOMIC COMPANY, a partnership composed of Gulf Oil Corporation and Scallop Nuclear, Inc., Plaintiff,

v.

EXXON NUCLEAR COMPANY, INC., a Delaware corporation, Defendant.

EXXON NUCLEAR COMPANY, INC., a corporation, and Exxon Corporation, a corporation, Counterclaim Plaintiff,

v.

GENERAL ATOMIC COMPANY, Counterclaim Defendant,

and

Gulf Oil Corporation, a corporation, and Scallop Nuclear, Inc., a corporation, Additional Counterclaim Defendants.

Civ. No. 78–0223–E.

United States District Court, S. D. California.

April 23, 1981.

Latham & Watkins, Max L. Gillam, Ernest J. Getto, Peter H. Benzian, Thomas M. Mustin, Karen R. Leviton, Los Angeles, Cal., for counterclaim defendant Gulf Oil Corp.

Sullivan, Jones & Archer, Jim Sullivan, Stephen P. Oggel, Jeffrey D. Lewin, David R. Markham, San Diego, Cal., Bogle & Gates, Ronald E. McKinstry and Richard M. Clinton, Seattle, Wash., Richard E. Keresey and Barry L. Wertz, New York City, for Exxon Nuclear Co., Inc. and Exxon Corp.

## MEMORANDUM AND ORDER

EDWARD A. INFANTE, Magistrate.

This matter is before the court on Exxon's Motion to Impose Sanctions on Gulf Oil Corporation, General Atomic Company, and Scallop Nuclear, Inc. (the counterclaim defendants) pursuant to Rule 37(b), Federal Rules of Civil Procedure, for failure to produce approximately 14,000 documents consisting of 40,000 pages located in Canada under the possession, custody, and control of Gulf Minerals Canada Limited (GMCL), a Gulf subsidiary. The withheld documents pertain to uranium marketing and activities of an international uranium cartel from 1971 through 1975 under which price controls and market allocations were established for sales of uranium throughout the world.

Discovery orders under Rule 37(a), F.R. Civ.P. requiring Gulf to produce documents responsive to Exxon's discovery requests were issued on November 16, 1979 and January 14, 1980. Gulf failed to fully comply with the discovery orders on the grounds that production of the withheld documents would violate Canadian penal law.

In its Motion for Sanctions, Exxon contends that the withheld documents are crucial to a fair trial of the case; that the failure to produce was caused in part by the fault of Gulf; and that due process requires the dismissal of the Complaint and entry of a default judgment on its Counterclaim.

The proceedings on this sanctions motion included twenty-three days of evidentiary hearing generating 3000 pages of transcript, approximately 2000 additional pages of various depositions introduced in evidence, and thousands of pages of documentary exhibits.[1] The parties have submitted lengthy memoranda and briefs before, during, and after the hearing which have been duly considered.

## I. BACKGROUND

This action was brought by General Atomic Company (GAC), a partnership composed of Gulf Oil Company (Gulf) and Scallop Nuclear, Inc. (Scallop) to enforce a uranium supply contract against Exxon Nuclear Company Inc. (ENC). As amended, GAC's complaint seeks a declaratory judgment that the contract under which ENC was to deliver six million pounds of uranium to Gulf is valid and binding. Plaintiff seeks specific performance and damages for breach in excess of $250,000,000.

As a defense, ENC asserts that the contract is null and void because it was made in violation of U.S. antitrust laws. ENC and its parent organization, Exxon Corporation (Exxon), have filed a counterclaim against GAC, Gulf and Scallop for antitrust damages under the Sherman Act, 15 U.S.C., Sections 1 and 2, declaratory relief, fraud, negligent misrepresentation, unfair competition, and intentional interference with a business expectancy. Counterclaim plaintiffs assert that Gulf secretly participated in an international uranium cartel beginning in 1971 until at least 1976, and that the

---

1. Exxon's exhibits have been designated by the prefix "DX". Gulf's exhibits have been designated by the prefix "G". "TR" indicates the sanctions hearing transcript.

uranium supply contract, executed in 1973, was part of Gulf's effort to gain control of a substantial portion of United States uranium for the purpose of furthering the uranium cartel's unlawful objectives and restricting the free market supply of uranium. Exxon seeks damages for injuries to its uranium business caused by Gulf's unlawful activities. The counterclaim defendants rely on various defenses including the act of state doctrine and sovereign compulsion.

### The Gulf Uranium Organization

Gulf through its divisions, affiliates, and subsidiaries is in the business of exploring for, acquiring, mining, milling and processing, fabricating, purchasing, and selling uranium and nuclear fuels. It entered the uranium business in 1967 by purchasing a company known as General Atomic which was a manufacturer of nuclear reactors. It operated as a Gulf subsidiary in San Diego, California under the name of Gulf General Atomic until it became part of a new division called Gulf Energy and Environmental Systems (Gulf Energy). This entity was involved in the marketing of uranium and the manufacturing and servicing of nuclear reactors.

In 1967 Gulf undertook the exploration and development of uranium ore bearing properties. A Gulf division in Denver, Gulf Minerals Resources Company (Gulf Minerals) was assigned responsibility for this production function of Gulf's uranium business. In 1967 Gulf discovered massive deposits of uranium at Rabbit Lake in Saskatchewan. Pursuant to Canadian law, Gulf established a wholly-owned subsidiary, Gulf Minerals Canada Limited (GMCL) headquartered in Toronto to develop the Rabbit Lake uranium project. Gulf Minerals in Denver had administrative responsibility to oversee GMCL's operations.

In addition to its Canadian uranium reserves, Gulf, through its division, Gulf Minerals, began to acquire substantial uranium reserves in the United States. In the early 1970's it acquired the Mt. Taylor property in New Mexico which contained the largest uranium ore deposit in the United States. Through Gulf Energy (San Diego), Gulf also engaged in the purchase of substantial quantities of uranium on the open market from other uranium producers and middlemen such as Exxon and ENC.

### The Gulf-Exxon Uranium Contract

During the summer of 1972, Gulf (through Gulf General Atomic) began negotiating with ENC, and in August, 1972, a letter of intent for the purchase of six million pounds of uranium by Gulf was signed. Draft contracts were negotiated until May 11, 1973, when a final contract was signed wherein ENC agreed to sell and Gulf agreed to buy at certain prices six million pounds of uranium to be delivered at the rate of one million pounds per year beginning in 1979. The contract was assigned by Gulf in December, 1973 to the plaintiff, General Atomic Company, a newly formed partnership between Gulf and Scallop. In 1979, Gulf bought out Scallop and obtained the sole beneficial interest in the "uranium business" of the GAC partnership. The settlement provided, *inter alia*, that Gulf would indemnify the partnership for losses, damages and judgments arising from the uranium business as well as for any liabilities incurred in connection with Gulf's participation in the cartel.[2]

In its counterclaim Exxon alleges that during the contract negotiations, Gulf representatives concealed the fact that Gulf was a member of a secret international uranium cartel that intended to restrict the uranium supply and increase uranium prices. During the five years following the contract the price of uranium increased rapidly to about six times the contract price. Exxon eventually learned of the existence of the cartel and Gulf's participation therein. In 1978 it informed GAC that it considered the contract null and void and

---

2. Scallop's liability with respect to the imposition of sanctions shall be treated as Gulf's. See DX 2909; DX 2967; DX 2966; DX 2861.

would not deliver the uranium, whereupon GAC instituted this litigation in April, 1978.

### The International Uranium Cartel

The precise facts regarding the creation, development, and operation of the cartel are not completely known because much evidence continues to be located in foreign countries. However, several matters appear to be well established from the available evidence.

It is undisputed that from at least 1972 through 1975 there existed a uranium cartel consisting of various international uranium producers and foreign governments including Canada, South Africa, Australia, and France.[3] The cartel members gathered at general cartel meetings throughout the world at places such as Johannesburg, Paris, Ottawa, Sydney, London, and Las Palmas. The cartel also had committees known as the Policy Committee and the Operating Committee which held meetings. In addition, the Canadian uranium producers met on a regular basis. From the available evidence, it appears there were at least 46 cartel meetings between February, 1972 and December, 1975.[4] Partial minutes of about eleven meetings are available.

The objectives of the cartel were evident from the Johannesburg Rules adopted in Johannesburg in late May of 1972 (DX 51b) and from available cartel minutes. The cartelists sought to restrict the supply of uranium, set minimum prices and conditions on the sale of uranium, and allocate the production and marketing of uranium among themselves. The members agreed that the existence and activities of the cartel were to be secret (DX 14b). The cover title of the organization was established as "Market Research Organization" for its dealings with the outside world (DX 1002c) (DX 51b). The organization was also referred to by its members as "The Club" and "SERU".

Gulf, acting through its Canadian subsidiary GMCL, became a member of the cartel at or before the Johannesburg meeting (May 28–June 2, 1972). In addition to the general manager of GMCL (Ediger of Toronto), three Gulf officials from the United States attended that meeting: Hoffman and Hunter from Gulf Energy (GAC's predecessor) and Roger Allen, a Gulf attorney from Gulf Minerals in Denver. Earlier, GMCL had been invited by the Canadian government to attend a meeting of Canadian uranium producers in Ottawa in February 1972. Ediger of GMCL and S. A. Zagnoli, president of Gulf Minerals (Denver) attended.

A major issue regarding the cartel in this litigation is the relationship between the government participants and the uranium producers. Gulf contends that the uranium cartel was initiated, mandated and directed by the foreign nations involved, and GMCL was compelled by Canada to comply with cartel terms.

A second area of major dispute is the scope of the cartel's activities. Although the Johannesburg Rules provided for the exclusion of the United States domestic uranium market from its terms, later cartel minutes indicate a broadening of cartel activities. The minutes of a September 5, 1972 cartel meeting reveal the prospect of taking anticompetitive actions against an American uranium producer:

> There followed a general discussion of the impact of Westinghouse bidding in Europe.... Some members thought that Westinghouse should be approached directly, whereas other views were that it would be a dangerous move. *The consensus finally reached was that if the club was to survive as a viable entity, it would be necessary to delineate where the competition was and the nature of its strength, as a prelude to eliminating it once and for all.* (Emphasis added) (DX 97d)

---

3. See Appendix A attached hereto, a list of uranium producer cartel participants other than Gulf.

4. Defense Exhibit (DX) 5051a is a chronological list of cartel meetings attached hereto as Appendix B.

## II. THE FOREIGN LAW IMPEDIMENT AND GULF'S EFFORTS TO OVERCOME IT

Gulf's reason for failing to comply with the discovery orders of November 16, 1979 and January 14, 1980 regarding documents in the possession, custody, and control of its Canadian subsidiary (GMCL) is that production would violate the Canadian Uranium Information Security Regulations (hereafter "Security Regulations") thereby subjecting Gulf and its Canadian personnel to criminal penalties. The Security Regulations became law on September 23, 1976, approximately 18½ months before GAC commenced this lawsuit. As amended, they provide that no person shall release any documents related to conversations, discussions, or meetings that took place between January 1, 1972 and December 31, 1975 involving the exporting from Canada or marketing for use outside Canada of uranium or its derivatives.[5]

It is undisputed that the Security Regulations apply to the documents being withheld, and that they prohibit Gulf from identifying as well as producing the regulated documents. Knowing consent or acquiescence to a violation of the Regulations could subject an individual or corporate entity to criminal prosecution (TR 61). Violation of the regulations is an offense punishable by imprisonment for up to five years and/or a fine not exceeding $10,000 (TR 58–59; G–6).

Gulf's position is that no Canadian documents are being withheld on the basis of any Canadian law other than the Security Regulations (Gulf's Post Sanctions Hearing Brief, p. 28; TR 99). Prior to the passage of the Security Regulations on September 23, 1976, Gulf relied on the Ontario Business Records Protection Act of 1947 (hereafter "Ontario Act") as an excuse for non-production of Canadian documents in other litigation.[6]

The Ontario Act forbids the removal of any business records from Ontario pursuant to an order of a foreign court unless such removal is a part of a regular reporting practice by a subsidiary to a foreign parent. The Act has no penal sanctions and is not enforceable unless a provincial court issues an order prohibiting removal. Because no such order has been sought or issued, the Ontario Act is not, nor has it ever been, a legitimate impediment to production by Gulf. See *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1143 (N.D.Ill.1979); *United Nuclear Corporation v. General Atomic Company*, 629 P.2d 231, 293 (N.M. 1980) (DX 5145).

During the course of this lawsuit, Gulf has made several good faith attempts to overcome the prohibitions of the Security Regulations. A Canadian law firm was retained in August of 1978 to explore methods by which GMCL's documents could be made available to this and other courts (TR 64). In a letter to the Canadian Minister of Energy, Mines and Resources, a meeting was requested to discuss several proposals (G–16). The meeting was unproductive and the Canadian government viewed the discovery requests as unacceptable (G–17). After the Canadian national election in May of 1979 resulted in a new government (Prime Minister Joseph Clark), Gulf counsel sent a letter dated September 12, 1979 to the Prime Minister and the new Minister of Energy, Mines and Resources requesting a

---

**5.** The Security Regulations provide, in relevant part:

"No person who has in his possession or under his control any note, document or other written or printed material in any way related to conversations, discussions or meetings that took place between January 1, 1972. and December 31, 1975 involving that person or any other person or any government, crown corporation, agency or other organization in respect of the production, import, export, transportation, refining, possession, ownership, use or sale of uranium or its derivatives or compounds, shall
    (a) release any such note, document, or disclose or communicate the contents thereof to any person . . .
    (b) fail to guard against or take reasonable care to prevent the unauthorized release of any such note, document or material or the disclosure or communication of the contents thereof."

**6.** See discussion *infra* at p. 303 and TR 633–635; DX 5143.

change of policy with regard to the disclosure of information governed by the Security Regulations so that production could be made in U.S. litigation (G–19). The Canadian response was negative (G–19a; TR 76–77), but nevertheless another meeting was held in March, 1980 in which Gulf and GMCL unsuccessfully renewed their requests for relief from the Security Regulations. (TR 82–86; G–20).

In addition, Gulf petitioned the Canadian courts for relief. Letters rogatory were presented to the Supreme Court of Canada on January 15, 1980 and Gulf presented oral argument on February 20, 1980. The Supreme Court denied the relief sought in a written opinion on March 18, 1980 (G–21; TR 81–82).

While Gulf's efforts to overcome the Security Regulations constitute a *prima facie* showing of good faith to comply with the production orders, Gulf's conduct prior to the passage of the Security Regulations must also be evaluated to determine the appropriateness of sanctions.

### III. BASIS FOR SANCTIONS

Gulf contends that because Canadian law forbids production of the cartel documents in the custody of GMCL in Canada, its failure to produce them in this litigation is due to an innocent inability to comply, and in view of its good faith efforts to produce, there is no basis for the drastic sanctions of dismissal and default judgment.

The power of a court to impose the severe sanction of dismissal for a party's failure to produce documents located under its control in a foreign country where disclosure is forbidden by foreign law was addressed by the Supreme Court in *Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). In that case a Swiss holding company brought suit against the Attorney General under the *Trading with the Enemy Act* for the return of property seized by the U. S. Government. Pursuant to discovery requests, the District Court ordered Societe Internationale to produce certain relevant records of its Swiss bank. The records were not produced on the grounds that production would violate Swiss secrecy laws which carried criminal penalties. The District Court ruled that unless full production were made, the complaint would be dismissed, but delayed dismissal while plaintiff attempted to negotiate with the Swiss government for release of the records. Several thousand documents were produced as a result of this effort, but full compliance with the production order was never realized. The District Court found the missing records might be crucial to outcome of the litigation and dismissed the complaint even though it had concluded that plaintiff had shown good faith in its efforts to comply with the court's order. On appeal the Supreme Court held that the production order was justified notwithstanding the penal nondisclosure law but that a party's failure to fully comply with the production order "due to inability fostered neither by its own conduct nor by circumstances within its control" does not justify the sanction of dismissal. 357 U.S. at 211, 78 S.Ct. at 1095. However, the Court did not completely preclude the imposition of sanctions. Rather, it held that a mere failure to satisfy a production order was a basis for sanctions and that the reasons for noncompliance and the good faith of the non-producing party "are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply." 357 U.S. at 208, 78 S.Ct. at 1094. The Court stated that in the absence of complete disclosure, the district court possessed "wide discretion to proceed in whatever manner it deems most effective", 357 U.S. at 213, 78 S.Ct. at 1096, such as drawing inferences of fact unfavorable to the non-producing party as to particular events related to the withheld documents.

It is clear from *Societe* that where a party's failure to comply with a production order has been due to its "willfulness, bad faith, or any fault", 357 U.S. at 212, 78 S.Ct. at 1096, the sanction of dismissal is not precluded. In making this determination, it is relevant to consider conduct of the non-producing party which occurred prior to the

commencement of the litigation in which the production orders are issued. In *Societe*, the Government contended that despite the plaintiff's diligent efforts to execute the production order, dismissal of the complaint was nevertheless justified because plaintiff took action in 1941 (seven years prior to suit) that caused its records to come within the Swiss secrecy laws, and thus it stood in the position of one who "deliberately courted legal impediments to production . . . and who thus cannot now be heard to assert its good faith after this expectation was realized." Although the contention was unsupported by a factual basis in the record, the Court stated that "these contentions, if supported by the facts, would have a vital bearing on the justification for dismissal of the action." 357 U.S. at 208–209, 78 S.Ct. at 1094.

Like the government in *Societe*, Exxon contends that Gulf has "courted the legal impediments" to production of the cartel documents. In evaluating this contention, we consider not only Gulf's recent efforts to comply with the court's orders, but also Gulf's conduct prior to passage of the Canadian Security Regulations (September 23, 1976) including an inquiry as to how the withheld documents came to be located in Canada.

■ In order to prevail on its motion for dismissal and default judgment, Exxon must establish by a preponderance of the evidence that: (1) the failure to fully comply with the production orders was caused by "willfulness, bad faith, or any fault" of Gulf; (2) the withheld documents may be crucial to the outcome of this litigation; (3) Exxon is prejudiced by the failure of discovery in the presentation of its case; and (4) the sanctions sought are commensurate with the prejudice to Exxon and the degree of fault attributable to Gulf.

## IV. GULF'S PRESENT INABILITY TO PRODUCE HAS BEEN FOSTERED BY ITS OWN CONDUCT

■ Exxon contends that any impediments to Gulf's present inability to comply with the production orders are attributable to Gulf's strategy of concealment. In support of this contention, Exxon claims that (1) Gulf housed its cartel documents in Canada in anticipation of uranium antitrust litigation, (2) Gulf failed to produce the cartel documents in other litigation prior to the passage of the Security Regulations, and (3) Gulf destroyed cartel documents which had entered the United States.

### Housing Documents in Canada

Soon after Gulf began its participation in the cartel in 1972, it established a policy of limited distribution of cartel-related documents by which such information would be housed in Canada, and transmittal to the United States would be avoided. Donald Hunter who was the director of Uranium Supply and Distribution at Gulf Energy in San Diego (GAC's predecessor) and attended the Johannesburg cartel meeting in late May of 1972 testified that

> There was a clear understanding that any documentation—any notes, any correspondence relative to the workings of the international producers would be limited to Canadian, that there would be no flow of information or documentation from Canada to the U.S. (Deposition of Don Hunter, DX 5148, p. 282–283)

When Hunter returned from Johannesburg, he destroyed his working papers from the meetings as the result of instructions from his superiors (DX 4440, p. 805).

About one month after Johannesburg, L. T. Gregg, a uranium market analyst employee under Hunter, was transferred by Gulf to GMCL in Toronto to serve as manager of international uranium sales. Gregg later became Gulf's representative on the cartel's Operating Committee. Although Gulf contends that the Gregg transfer to Toronto was for sound business reasons, there is evidence that the purpose of the transfer was to implement the cartel concealment policy. Hunter has testified that Gregg was transferred to Canada "because we did not want documentation relating to the cartel in San Diego, Gulf Energy and Environmental Systems files." (DX 4440, p. 784–5 citing DX 4393, p. 98). In his

testimony, Gregg admitted that if he remained based in San Diego, cartel documentation in the United States could not have been avoided.

> Q. ... Now, if you had remained based in San Diego, how in the world could you have avoided generating documents with regard to the activities of the uranium cartel? You couldn't, could you?
> A. Sitting here today and trying to imagine a way to do it, no, I cannot. (TR 1179)

Gregg also testified that after arriving in Canada, he had an understanding with Ediger, the General Manager of GMCL, to avoid transmittal of documents reflecting cartel activities into the United States (TR 1016–1017) and that he "didn't send any club documents to anybody in the U.S." (TR 1041)

Instead, some cartel-related documents that had accumulated in the United States were sent to GMCL in Toronto. On October 6, 1972, Roger Allen, general counsel for Gulf Minerals shipped cartel-related documents from Denver to GMCL in Toronto. This shipment took place shortly after Allen had received the minutes of the Ottawa cartel meeting of September 5, 1972 wherein the members reached the consensus that "if the club was to survive as a viable entity, it would be necessary to delineate where the competition was and the nature of its strength, as a prelude to eliminating it once and for all." (DX 97d). Allen testified that he could not remember what documents he sent to Toronto and that the purpose of the shipment was for legitimate business reasons pertaining to forthcoming arbitration negotiations with Gulf's partner, UCL in the Rabbit Lake uranium project. Mr. Allen did admit that the shipment consisted of "all of the important cartel documents" (TR 2284). Mr. Gregg of GMCL to whom the documents were sent testified that the purpose of Allen's ship-

ment was to carry out the secrecy policy.[7] (TR 1163–1164). It is significant that Allen neither listed nor copied the documents shipped (TR 2281) and that he knew that Ediger at GMCL already had copies of the cartel documents shipped to him (TR 2284).

Gulf contends that the limited distribution policy regarding cartel related documents was not adopted or followed in anticipation of litigation or to frustrate discovery. Frank O'Hara, a Gulf attorney testified that dissemination was limited for several legitimate reasons. First, wide dissemination would have been inconsistent with the Canadian Government's policy that documents referring to the cartel be accorded confidential treatment and the Government's express statement that information relating to the terms and conditions under which export permits would be granted would not be released since it was not in the public interest to do so (TR 1482). Second, the cartel and the Canadian Government's minimum pricing and quota allocation requirements applied only to GMCL, a separate Canadian corporation (TR 1482–83). Thus there was no business need for general dissemination to others within the Gulf organization (in the U.S. or elsewhere) of documents relating to the formation or operation of the cartel. Third, since many cartel-related documents were considered by the Gulf Law Department to be subject to the attorney-client privilege, O'Hara was concerned that their circulation outside the "control group" might constitute a risk of waiver (TR 1483–84). Fourth, the wide dissemination of cartel-related documents in the United States was unnecessary and undesirable since the United States market was excluded from the cartel.

Gulf's argument that it was a legitimate business practice to avoid dissemination of cartel documents to its offices in the United

---

7. Q: "... Did Mr. Allen tell you or did you form the opinion that Mr.—Mr. Allen sent those documents up because he did not think those documents should be kept in the U.S. because it might be viewed as unlawful under U.S. antitrust laws?"

A: "As I best recall, there was some concern of that nature on Mr. Allen's part." (Gregg, TR 1163)

States is not convincing. Although GMCL is headquartered in Canada, many Gulf officials from the United States participated in meetings of the cartel (e. g. Zagnoli & Allen of Gulf Minerals and Hunter & Hoffman of Gulf Energy). At the important Johannesburg meeting in May 1972, three of Gulf's four attendees were from the United States. Moreover, Gulf attorney Frank O'Hara of Pittsburgh had been assigned the duty of monitoring cartel developments from an antitrust standpoint. (TR 2359) At a meeting in Toronto in July of 1972, attended by Zagnoli of Gulf Minerals, Ediger of GMCL and several Gulf attorneys, including O'Hara, it was decided that:

> Nevertheless, it will be advisable that Frank [O'Hara] be kept adequately and currently informed of significant developments which might affect Gulf's overall antitrust posture. (DX 74b)

Surely, normal business practice would have resulted in copies of cartel minutes being sent to O'Hara. But, O'Hara never received any cartel minutes after September 1972. (TR 1561, 1691)

Contrary to Gulf's position, there is substantial evidence that the policy of avoiding dissemination of cartel-related information to Gulf offices in the United States was motivated in large part by apprehension of antitrust litigation. Gregg testified that one of the reasons for the policy was that he and Ediger "had [an] awareness of the fact that there was a set of antitrust laws in existence in the United States under which this [cartel] activity might be construed as being illegal." (TR 1037) In his testimony before the Grand Jury in 1977, Gregg stated:

> Q. The documents that you worked with in your capacity as Marketing Manager for Gulf Minerals Canada, Limited,—
>
> A. Yes.
>
> Q. —were there any efforts on your part or other employees of Gulf to isolate them from other Gulf subsidiaries or the Gulf parent and did you make a conscious effort to keep them in Canada?

> A. Yes.
>
> Q. Why is that?
>
> A. We didn't feel they should be distributed either outside of our offices or outside of Canada.
>
> Q. What was the basis for that decision?
>
> A. Again, *an apprehension that perhaps this might result in investigation under the antitrust laws, under the U.S. antitrust laws.*
>
> Q. Point of clarification. When you are talking about keeping documents in Canada, you are not talking about general documents related to your activities as marketing manager?
>
> A. No.
>
> Q. You are talking specifically about documents relating to the operation, formation and activities of the club, is that correct?
>
> A. That is right. *We sent a large number of marketing-related documents to the States,* to Denver and Pittsburgh, *but not any that related to these club activities.*

(Gregg; Grand Jury, 2/22/77 at 106–7 [emphasis supplied], admitted TR 1034–5, and Gregg deposition, DX 4472, p. 506–507.)

A few months after the limited dissemination policy was established, Gulf attorney O'Hara prepared a memorandum of law in November, 1972 dealing with the strategy of utilizing the Ontario Business Records Protection Act as a possible impediment to production of cartel-related documents housed in Canada. The preface of that memorandum provides:

> The question of the authority of a United States court to require production of documents located in the office of a foreign subsidiary or affiliated company may well be of considerable importance in the event the United States Justice Department should become interested in investigating the activities of this organization. (DX 1117a)

The memorandum analyzes the Ontario Act and its shortcomings as a discovery impedi-

ment because of the absence of criminal sanctions without prior Canadian government action, but O'Hara notes that "Presumably, the Canadian Government would object to any disclosure of the SERU [8] documents . . ." (DX 1117a) At the hearing, O'Hara admitted that he anticipated a Department of Justice antitrust investigation into the activities of the cartel when he prepared the memorandum. (TR 1567)

Anticipation or fear of civil antitrust litigation in the United States is expressed in a GMCL memorandum prepared by Gregg, Ediger and Boyce in September 1973 in which they observed:

> Any tampering with "the trade and commerce of the United States", whether it be solely concerned with uranium for U.S. consumption or with a U.S. company who is carrying on foreign operations, invites the hot breath of the Sherman Act. U.S. case law abundantly proves that the arm is long and that treble damage litigants are often successful, both at home and abroad.

> GMCL, because of its parent corporation, is probably the most vulnerable to an antitrust action filed in the U.S., and likely would be the first target that a U.S. litigant would go after, whether or not GMCL had any dealings with that litigant or not. (DX 2756a, at B-17-18)

The evidence clearly supports a finding that Gulf followed a deliberate policy of storing cartel documents in Canada with the expectation that they would be unavailable for discovery in anticipated litigation in the United States. For this conduct to amount to "courting legal impediments" to production under *Societe, supra*, it is not

required that the actual litigation in which the documents are ultimately ordered produced must be either pending or specifically contemplated at the time the housing policy was initiated and followed. *United Nuclear Corporation v. General Atomic*, 629 P.2d 231, 308-309 (N.M.1980) (DX 5145).

### Gulf's Failure to Produce the Cartel Documents in Other Litigation Prior to the Passage of the Security Regulations

Gulf's anticipation of litigation became a reality in late 1975 when it learned of a Department of Justice investigation into the activities of the cartel and when the *UNC* case was filed in New Mexico. (*United Nuclear Corporation v. GAC*) (DX 5145) Discovery requests in the *UNC* case requiring GAC to produce documents including the Canadian cartel documents were issued in 1976 several months prior to the passage of the Security Regulations. GAC produced its business records in the summer of 1976 but did not produce the cartel documents. After September 23, 1976, GAC relied on the Regulations as an impediment to production.[9] The trial judge ultimately imposed sanctions of default judgment against GAC in 1977 finding that GAC had acted in bad faith and had deliberately housed cartel documents in Canada in an attempt to court legal impediments to their production.

On appeal, the New Mexico Supreme Court affirmed the decision [10] stating:

> Had GAC been more assiduous in its responsibility in discovery prior to September 23, 1976, Canadian cartel discovery could have been made without any serious foreign law entanglements. *Ac-*

---

8. SERU is a French acronym for the uranium cartel.

9. GAC also attempted to justify non-production of the cartel documents on the ground that it was not obliged to produce documents in the possession of Gulf. GAC was a partnership entity composed of Gulf and Scallop. This argument was rejected by the trial court in November 1976.

10. Exxon has urged the court to give the New Mexico state court rulings collateral estoppel effect thereby foreclosing Gulf from litigating

the issues raised here in opposition to sanctions. We decline to apply collateral estoppel because the issues here are not identical, and moreover, the findings of the New Mexico trial court on which the default judgment against GAC was based were made without affording GAC an evidentiary hearing at which it could have attempted to refute UNC's allegations of bad faith and courting legal impediments to production, etc. However, we take judicial notice of the opinion of the New Mexico Supreme Court (DX 5145).

cord *State of Ohio v. Crofters, Inc.,* [D.C.] *supra,* 75 F.R.D. [12] at 23. By failing to provide cartel information prior to the passage of the Canadian Uranium Information Security Regulations, and then relying on these Regulations as an excuse for nonproduction, GAC is "in the position of having slain [its] parents and then pleading for mercy on the ground that [it] is an orphan." *Life Music, Inc. v. Broadcast Music, Inc.,* [D.C.] *supra,* 41 F.R.D. [16] at 26. *Accord Shepard v. General Motors Corporation,* 42 F.R.D. 425, 427 (D.N.H.1967). (DX 5145, 629 P.2d at 293).

In addition to the *UNC* case, another uranium action entitled *GAC v. Ranchers Exploration & Development Corp., et al.* (New Mexico state court) was pending in early 1976 in which discovery requests sought production and identification of the Canadian documents. Interrogatories and document requests were served on GAC in May 1976 by Ranchers. (DX 5024, DX 5025). GAC's counsel then negotiated with Ranchers' counsel (Marshall Martin) to limit the scope of the discovery requests. In those negotiations, Gulf's counsel informed Ranchers' counsel that the Ontario Business Records Protection Act barred production of Canadian documents.[11] As a result of that representation, counsel entered into a stipulated order (DX 5026) excluding Gulf's Canadian documents from discovery. Later, Ranchers' counsel learned that GAC's position regarding the Ontario Act was not accurate, and described his reaction as, "I thought I was had." (TR 636) (Deposition of Marshall Martin, DX 5143).

It is not the court's intention to speculate whether the Canadian documents should have been produced in the Ranchers' litigation. Indeed, no order to that effect was ever entered. The relevancy of the *Ranchers'* case to our proceedings is simply that (1) there was litigation pending (in addition to the *UNC* case) before the Security Regulations were passed in which Canadian uranium documents were sought and (2) Gulf

again relied on the Ontario Act as a discovery impediment which Frank O'Hara analyzed in his 1972 memorandum.

Contemporaneous with the pendency of the *UNC* and *Ranchers* cases, Gulf became involved with a grand jury investigation. In June of 1975 Gulf learned of a Justice Department investigation into the cartel. (DX 4218a) (DX 4262a). On November 11, 1975, Gulf attorney Frank O'Hara met with a Justice Department attorney who told him that the Department suspected that "the increases in uranium prices are tied to the alleged meetings" of the cartel members and that "there is a possible CID in the air" (DX 4132). Gulf reacted to this warning by attempting to marshall evidence to support antitrust defenses of sovereign compulsion and act of state. On December 4, 1975 at Roger Allen's request, a GMCL employee in Toronto gathered Canadian government public statements relating to the uranium cartel. This collection of public statements was sent to O'Hara in Pittsburgh and Allen in Denver. (TR 2368–71, DX 1219) (TR 1759–1762)

On June 16, 1976, Gulf was served with a Grand Jury subpoena calling for production of cartel documents "wherever located." (DX 2915) Other Canadian cartel members were also served (DX 2903a). Gulf retained the law firm of Howry & Simon in Washington to represent it in connection with the Grand Jury subpoena. On June 23, 1976 attorney Allen sent a copy of the Ontario Business Records Protection Act to Jack Howry and O'Hara (DX 5155). O'Hara sent a copy of his 1972 memorandum dealing with the Ontario Act to Howry & Simon in preparation for a meeting to be held on July 1, 1976 in Washington.

On June 30, 1976, GMCL president, Andrew Janisch of Toronto called S.A. Zagnoli, president of Gulf Minerals in Denver and reported as follows:

> Mr. Janisch has been advised by telephone by the Energy, Mines & Resources people that they are convening a meeting of Canadian producers on July 13 in Otta-

---

11. Gulf repeated that the Ontario Act was an impediment to discovery in a letter dated Au-

gust 19, 1976 from a GAC attorney to Ranchers' counsel (DX 2918).

wa. Those invited are those who have received a subpoena from the Grand Jury. *He has been told (or has concluded) that the Canadian government may decide that Canadian producers will be prohibited from passing on any information concerning Canadian uranium operations and the functions of their control over the uranium industry.* (DX 2903a, emphasis supplied)

The next morning, Gulf Minerals attorney Allen and O'Hara met with Howry & Simon attorneys in Washington. They discussed the grand jury subpoena, and the Ontario Act as a possible impediment to production of documents from Canada (TR 1862–63; TR 1871–2; TR 1885). At the meeting, Allen conveyed the news from Zagnoli that the Canadian government may decide to prohibit the Canadian producers from disclosing any information in response to the subpoena concerning the uranium industry. (TR 1877) (DX 2903a) In July 1976 three news articles appeared in Toronto newspapers reporting the U.S. Justice Department's investigation into the uranium cartel and the resistance by Canadian government officials to the subpoena. (DX 4264, DX 4265, DX 4266).

A meeting of Canadian government officials and Canadian uranium producers took place on July 13, 1976 (DX 2903a), but it is not known whether GMCL or Gulf personnel attended. On the same day five Gulf attorneys (O'Hara, Allen, Groves, Dotson, and Gidel) met in Pittsburgh to discuss the grand jury subpoena. (DX 5154). Two weeks later, Gulf in-house lawyers O'Hara, Allen, Groves and Dotson met with Howry & Simon lawyers to discuss the "grand jury uranium investigation" (DX 2923a). The agenda of that meeting reflects that the lawyers discussed:

> GMCL files in Toronto, status of review.... Notice to Canadian Government before any Toronto files moved out of Canada. (DX 5156)

Gulf personnel did not move files out of Canada or duplicate the cartel-related documents for dissemination to the United States in preparation for compliance with the grand jury subpoena. However, they did prepare an inventory of the Canadian documents. In early July, Allen sent instructions to GMCL with a copy of the subpoena.[12]

GMCL retained a Toronto law firm to conduct an inventory of its cartel documents. In August, Gulf attorneys Dotson and Gidel visited Toronto to assist in the project. They were instructed "not to bring back any documents." The Gulf attorneys returned from Toronto with inventory worksheets identifying 3,400 cartel documents (DX 2899) along with notes of Dotson. (Dotson depo. DX 5083)[13] O'Hara was told of the worksheets (DX 2899) and Dotson notes (DX 2898), but these items were never produced to the Grand Jury or to any litigant until June 1980, when they were produced in the *Westinghouse* case (See, *In re Uranium Litigation, supra*).

12. "While Gulf Oil Corporation ... may in some instances be prohibited from producing documents not within the United States, all of which may be clarified to some extent after the meeting with the Minister of Energy, Mines and Resources scheduled in Ottawa on July 13, 1976, it nevertheless seems advisable that you at least commence a search to determine what documents you may have in the Toronto office which have not been previously furnished to either the Denver or Pittsburgh office. Accordingly, I transmit herewith a copy of the Subpoena (attachment No. 1) and a copy of a form entitled 'Identification of Document Record' (attachment No. 2) with accompanying instructions, which may be used in your search." (DX 2904)

13. The worksheets consist of 265 pages of inventory composed as follows:

| Subpoena paragraph | File location Room #, Cabinet #, & Drawer # | Title of File | Document Title/ Subject | Date of Doc. | Type of Doc. | Law Dept. Use Only |
|---|---|---|---|---|---|---|
| | | | | | | |

On September 9, 1976, a Howry & Simon lawyer (Melvin Halpern) drafted a memorandum of law dealing with the weakness of the Ontario Act as a discovery impediment. He pointed out that the Ontario Act was not self-enforcing and did not subject Gulf to criminal sanctions unless the Attorney General of Canada took action in a provincial court. He advised Gulf that one alternative would be to seek authority from the Canadian government for removal of documents thereby alerting them of the need for government action to make the Ontario Act an effective impediment. (DX 5157) [14] The Halpern memorandum of September 7th was sent to O'Hara the following week. Two days before the Halpern memo, Howry & Simon began producing Gulf documents to the Justice Department (DX 2945). No Canadian documents nor the Dotson worksheets were included in the production.

On September 23, 1976, the Uranium Information Security Regulations were promulgated by Canada (G–1). Four days later, a Howry & Simon attorney wrote to the Justice Department:

> We would like to meet with you this week at your convenience to discuss the matter of Canadian documents located in the offices of Gulf Minerals Canada, Ltd., in Toronto, Ontario . . . .
>
> bcc: Frank O'Hara
> Roger Allen
> Thomas Groves (DX 2946)

There is no direct evidence of collusion between Gulf and Canadian governmental officials in the months preceding the Security Regulations. It is not known whether Gulf contributed to the passage of the Security Regulations. It appears there was enough governmental self-interest manifested by the Canadian officials to promulgate the

Regulations regardless of Gulf's interest. However, it is clear that since 1972, Gulf was prepared to rely on the Ontario Act as an impediment to production of cartel-related documents in Canada. The impediment could be realized if Canada took necessary court action to trigger its enforceability as discussed in the O'Hara memorandum of 1972 and the Halpern memorandum of 1976.

The New Mexico Supreme Court in *UNC v. GAC, supra*, held that the housing of documents in Canada with the expectation that the Ontario Act would serve as the impediment amounted to "courting legal impediments" to production.

Although the Uranium Information Security Regulations were not in effect during the period the cartel was apparently in existence, the Ontario Business Records Protection Act was in effect. Although that Act is not a significant impediment to discovery, it was relied on by GAC in the court below as a total bar to the discovery of cartel records. If documents were housed in Canada with the expectation that the Ontario Act would be applicable, it is largely immaterial that the expectation was later realized in the form of a different secrecy law. When a party places documents outside this country with the expectation that production of those documents will be frustrated in litigation here, the strong policy in favor of broad discovery dictates that that party bear the consequences of the dilemma created by the realization of its expectations.

·   ·   ·   ·   ·

We hold . . . that there is substantial evidence to support the court's finding that Gulf followed a deliberate policy of storing cartel documents in Canada, and

---

14. "*Unfortunately . . . the [Ontario] Act is not self-enforcing.* We should be prepared to argue that the Ontario Act is a bit confusing insofar as it seems to prohibit the removal of documents before and after an application is filed with a judge, even though criminal penalties are prescribed only for acts occurring after the application. *See* Section 2 of the Act. We should argue that the confusion can be cleared up only by authorization from the Canadian

Government. *Seeking such authorization has the added advantage that we will inform the Canadian Government of the apparent non-criminal character of document removal prior to the filing of an application. Hopefully, the Attorney General will then file the application described in Section 2 of the Act, prior to judicial resolution of the subpoena.*" (DX 5157, at 15, emphasis supplied)

that this policy amounted to courting legal impediments to their production. Under *Societe*, these findings alone may be the basis for the imposition of such a discovery sanction as a default judgment. *United Nuclear Corp. v. GAC*, 629 P.2d 231, 308–309 (N.M.1980) (DX 5145)

Prior to September 23, 1976, Gulf had the ability to produce the Canadian documents without subjecting itself or its personnel to criminal sanctions. Had Gulf complied with the Grand Jury subpoena, or at least removed copies of the documents to the United States in preparation for a good faith compliance, the withheld documents would now be available for trial in this litigation. Instead, Gulf relied on the Ontario Act hoping Canada would perfect the legal impediment.

### Destruction or Disappearance of Cartel Documents in the U.S.

In addition to charging that Roger Allen shipped cartel-related documents to Canada in 1972 to make them unavailable in anticipated litigation (*supra*, p. 297), Exxon further claims that Gulf destroyed or altered cartel documents which had entered the United States.

In early December 1975 William Dix, a marketing research analyst employed by GAC, had a conversation with Tom Groves, a GAC in-house attorney, who was later transferred to Gulf's headquarters in Pittsburgh. According to a memorandum later written by Dix, Groves requested him to:

> Peruse our files to see if there was any information on meetings Gulf Canada, Ltd. (GCL) may have held with other uranium products [sic] in Canada. He [Groves] indicated the Justice Department was looking at possible antitrust violations. At that time he also suggested I throw away any old files pertaining to GCL. (Dix memo to file, DX 4164)

In January 1976, Dix found a "book, perhaps a half inch thick, filled with various memorandum [sic] of meetings" (Dix depo, DX 5086 at 37–38). The book dealt in part

with a GMCL meeting in Ottawa and included memos written by Gulf personnel "about a meeting of Canadian uranium producers", which "appeared under a tab 'Paris Meeting'". (DX 4164) On February 12, 1976 Dix met with Groves at GAC in San Diego and handed the book to Groves (DX 5086 at 40, 49–50). The exchange is described in Dix's memorandum as follows:

> Tom read the book. When he finished we had the following conversation as close as I can reconstruct it.
>
> Tom: I'll take this book and probably destroy it.
>
> Bill: If anyone asks me about it I'll tell them I gave it to you.
>
> Tom: No, that won't be necessary. Just say you never saw it.
>
> Bill: No, I won't do that. I will always tell the truth.
>
> Tom took the book with him when he left.
>
> (Dix memo, DX 4164)

It is unknown what Groves did with the book. Gulf has not been able to locate a book meeting Dix's description, and Exxon asserts that the GAC cartel book has never been produced by Gulf.

Dix testified at the sanctions hearing that he prepared the memo (DX 4164) because he was disturbed by the conversation with Groves (TR 418). The memo was prepared on February 25, 1976 on the advice of a fellow employee.[15] Although Dix's recollection has dimmed, he recalls being told by Groves that he (Dix) "should forget that I saw the documents" (TR 418–19). Groves denies destroying any documents. He denies the conversations with Dix that are memorialized in the Dix memo. (Groves video tape depo, G–635 at 118–122) However, Dix's monthly diaries corroborate the events described in his memo. His diaries for November and December of 1975 show that he met or talked with Groves on November 18, December 4 and 12, 1975 (TR 514–19). The entries for December 12 include "files for Groves". (DX 5090) Dix

---

**15.** The Dix memo was produced by Dix himself from his personal files at home at the time of his deposition in June 1980 (Dix depo, DX 5086).

testified that this entry relates to the files Groves asked him to search regarding the Justice Department investigation (TR 519–20). The diary also contains entries showing that Dix "read files for Canadian info" and "call to Groves re above" (TR 520). The February, 1976 diary contains an entry for February 12 as follows: "Give GCL book on U meeting Ottawa book to Groves." (DX 5092) (TR 525–26)

The credible evidence supports a finding that the GAC cartel book has been destroyed or concealed and that such action was motivated by the Justice Department investigation into the activities of the cartel.[16] It is also significant that interrogatories requiring identification of cartel-related documents in GAC's files had been served on GAC in December 1975 in *United Nuclear v. GAC* pending in New Mexico state court. (DX 5145 at 93–96 & 111–12).

Exxon has alleged other instances of destruction or disappearance of documents in Gulf's domestic files (Exxon Post Hearing Brief, pp. 52–66) and one instance of an "altered" document (DX 1539). However, the evidence fails to establish that these instances were motivated by pending or anticipated litigation or done in bad faith.

Whether the destruction of the GAC "cartel book" is a sufficient basis in and of itself for the imposition of serious sanctions, such as those sought by Exxon, is unclear. Although this lawsuit had not been filed and may not have been specifically anticipated at the time of the destruction, it is likely that the destruction was in bad faith to preclude discovery in other similar litigation pending. "Although, a potential litigant is under no obligation to preserve every document in its possession, whatever its degree of relevance, prior to the commencement of a lawsuit, . . . some duty must be imposed in circumstances such as these lest the fact-finding process in our courts be reduced to a mockery." *Bowmar Instrument Corp. v. Texas Instruments, Inc.*, 25

F.R.Serv.2d 423 (N.D.Ind.1977). See also *Alliance to End Repression v. Rochford*, 75 F.R.D. 438 (N.D.Ill.1976).

The destruction or disappearance of the GAC cartel book when combined with Gulf's housing of documents in Canada constitutes a sufficient basis of fault under *Societe Internationale v. Rogers, supra*, to conclude that harsh sanctions against Gulf are not precluded.

## V. THE WITHHELD DOCUMENTS ARE CRUCIAL TO A FAIR TRIAL

In determining what sanctions are appropriate, the needs of the discovering party must be evaluated as well as the fault of the non-producing party. Specifically, we must consider how the absence of the withheld documents impairs Exxon's ability to establish its claims or defenses. *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 505 (4th Cir. 1977). Gulf contends that the missing documents are not essential and are merely cumulative of the available cartel evidence. It argues that the available evidence, consisting of documents produced by Gulf from its U.S. files and the testimony of Gulf personnel who attended cartel meetings, provides a wealth of information on the cartel and GMCL's activities in connection therewith. It points to the Johannesburg Rules (G–51), the Rules for Orderly Marketing (DX 292b) and other documents[17] as well as the testimony of Gregg, Allen and O'Hara in support of its contention.

The attorney inventory worksheets (DX 2899) and the Dotson notes (DX 2898) prepared in Canada and brought to Gulf's headquarters in the United States by Gulf attorneys Gidel and Dotson in August of 1976 are somewhat helpful in describing the nature of the withheld documents. The missing documents include minutes of cartel meetings, communications between the Canadian government and GMCL, and various copies of telexes from Andre Petit, the

---

16. O'Hara's meeting with the Justice Department in which he was advised that a CID "was in the air" occurred on November 11, 1975 (DX 4132).

17. Exhibit A attached to Gulf's Post-Hearing Brief lists the "available evidence" which Gulf contends eliminates the need for the 14,000 withheld documents in Canada.

Cartel Secretariat in Paris, to Runnalls of the Canadian Department of Energy, Mines & Resources relating to bids and allocation of uranium sales. Some of these documents may be crucial to the outcome of this litigation. For example, an entry appearing on page 2 of the inventory shows that at the London cartel meeting of October 6, 1973, members agreed to fix prices in the U.S. market: "agreement that no bids to U.S. market would be made below club prices" (DX 2899 at 2). It would appear that a complete set of the London minutes is crucial to disprove Gulf's contention that cartel arrangements excluded the U.S. market. Gulf argues that Dotson may have mischaracterized the London document she was reviewing and inaccurately reported on its contents. Gulf points to available evidence to the contrary regarding the cartel and the U.S. market. Exxon replies by pointing to an O'Hara file memo of October 15, 1973 (DX 264) dealing with a telephone call about the London meeting which appears to be consistent with Dotson's description in the worksheets.[18] This debate underscores the need for all the cartel-related documents in the search for truth.

The available evidence indicates that there were at least forty cartel meetings of international uranium producers between 1972 and 1975. (DX 5051a). Exxon has partial minutes for eleven of these meetings. The last meeting for which Gulf produced minutes from its domestic files was the Ottawa meeting of September 5, 1972 attended by Ediger, Gregg of GMCL and Zagnoli of Gulf Minerals. (DX 96b). Exxon does have partial minutes for two meetings in 1973 (London, October 5–9, 1973 and Las Palmas, November 21–23, 1973) which cannot be authenticated and may be inadmissible in evidence without stipulations. These documents (DX 474 and DX 273) were apparently stolen by an environmental group known as "Friends of the Earth" from an Australian uranium producer, Mary Kathleen Uranium Ltd., a cartel member.[19] The withheld cartel minutes are particularly critical because it appears from the available evidence that the scope of the activities of the cartel may have changed after Johannesburg in 1972.[20] The broadening of cartel activities after Johannesburg impacts on Gulf's defenses of sovereign compulsion and act of state. Did the cartel uranium producers exceed the involvement or requirements of the Canadian government? It is impossible to determine the entire range of cartel activities without the withheld minutes and other documents listed in the worksheets. A comparison of the worksheets and Dotson notes with Gulf's "Chronological Index and Summary of Cartel-Related Documents Produced from the Files of Gulf Oil Corporation" (DX 2976a) shows that the withheld cartel documents are not merely cumulative of the available evidence as Gulf speculates.[21]

The testimony of Gulf witnesses relying on their memories is no substitute for the withheld documentary evidence. Memories have faded and, in some cases, have become selective. Mr. Gregg cannot recall what is written in the withheld documents, nor can he remember what was said at the various cartel meetings from 1972–1975 without referring to the documents. The testimony of Gregg did disclose that there was an

---

18. "Roger Allen called the other day to report that Nick Ediger was currently in London attending a meeting of the SERU group.

. . . . .

The Canadian Government has changed its position and stated that it will not approve exports of Canadian uranium into the United States at less than group prices. [This] could have a bearing on the U.S. antitrust posture of this group . . ." (DX 264)

19. There are approximately 40 Friends of the Earth documents available to Exxon, but their admissibility in evidence has been questioned.

20. Compare the Johannesburg Rules excluding the U.S. domestic uranium market with Ottawa minutes of September 5, 1972 which indicate the cartel was considering the prospect of taking anticompetitive actions against the foreign uranium operations of American corporations and agreed to eliminate competition once and for all (DX 96b). Compare also DX 264 re the London meeting, *supra*, footnote 18.

21. See DX 5007, a chart compilation of file titles from the worksheets compared with Gulf's List of Available Documents (DX 2976a).

"Exxon file" at GMCL, but he cannot recall its contents (TR 1136). He admitted that at the Paris cartel meeting in April 1973, the subject of a proposed uranium purchase by Exxon from Nufcor (a South African uranium producer and cartel member) was discussed, but he could not remember anything further. (TR 969). Gregg also recalls seeing some Canadian minutes in GMCL's files on the Las Palmas meeting in November 1973 where the cartelists discussed negotiations with uranium middlemen (TR 967–969):

### Negotiations with Middlemen

It was agreed that nobody would enter into serious discussions with Westinghouse before coming back to the club. Denison and Nufcor have been approached by Exxon [ENC]. (DX 273) Since only a partial set of the Las Palmas minutes are available from "Friends of the Earth", it is unknown what steps, if any, were taken regarding Exxon and Westinghouse in 1973.

The withheld documents have previously been determined to be relevant and crucial to the issues raised by the pleadings. In a related case, *Uranium Antitrust Litigation*, MDL 342 (N.D.Ill.), Judge Marshall described the nature of cartel-related Canadian documents as follows:

The second consideration is whether the requested documents are crucial to the determination of a key issue in the litigation. Plaintiffs' showing on this factor is simply overwhelming. All of the discovery requests now at issue are directly relevant to a number of fundamental issues in the complaint, answers, affirmative defenses and counterclaims in this litigation. Plaintiffs seek vital information relating to, among other things, the time period when the alleged conspiracy of uranium producers was carrying out its activities, defendants' alleged efforts to conceal their conspiracy, the im-

pact of that alleged conspiracy on United States interstate and foreign commerce, the defendants' defenses of sovereign compulsion, and information on uranium sales and market conditions. Plaintiffs have submitted voluminous exhibits which give a sketchy picture strongly supporting their allegations in these areas but also suggesting that there are larger gaps in defendants' document production.

.     .     .     .     .

The inevitable inference is that the withheld information is likely to be the heart and soul of plaintiffs' case.[22] 480 F.Supp. 1154–5.

From a detailed examination of the available evidence, along with the worksheet descriptions of the withheld documents, it is clear that Gulf's failure to comply with the production orders has deprived and prejudiced Exxon of a full and fair opportunity to cross-examine Gulf's witnesses, to defend against GAC's Complaint, to present its claims pleaded in the Counterclaim, and to rebut Gulf's defenses to its antitrust claims.

## VI.   SUMMARY OF FINDINGS

After considering the entire record of evidence and assessing the credibility of the witnesses, the court makes the following findings:[23]

1. Gulf has sole beneficial ownership and control over the GAC—ENC uranium contract and of counterclaim defendants' other uranium business interests involved in this litigation.

2. Gulf has failed to fully comply with the production orders of November 16, 1979 and January 14, 1980.

3. Gulf is withholding approximately 14,000 documents in the possession, custody, and control of its wholly-owned subsidiary, Gulf Minerals Canada Limited (GMCL) on the grounds that production would violate Canadian penal law.

---

**22.** Judge Marshall specifically rejected Gulf's contention that the unproduced documents are cumulative of presently available discovery. 480 F.Supp. 1155.

**23.** The court has made numerous findings in the course of discussing the evidence in Sections I–V, *supra*. This summary of findings is merely a recapitulation.

4. Production of the documents withheld at GMCL would violate the Canadian Uranium Information Security Regulations. Violation of the Regulations is punishable by imprisonment up to five years and a fine not exceeding $10,000.

5. During this lawsuit, Gulf has attempted to negotiate with the Canadian government for relaxation or waiver of the Security Regulations and has pursued the matter in Canadian courts. Gulf has taken every reasonable effort available to overcome the prohibitions of the Security Regulations.

6. Gulf's conduct prior to the passage of the Security Regulations is relevant to determine whether its failure to comply with the discovery orders is attributable to "willfulness, bad faith, or any fault" of Gulf.

7. Gulf's present inability to comply with the production orders was fostered by its own conduct and is attributable to a deliberate strategy of concealment.

8. Gulf housed cartel documents in Canada with the expectation that they would be unavailable for discovery in anticipated antitrust litigation in the United States.

9. Gulf destroyed or shipped cartel-related documents to Canada to make them unavailable for discovery in anticipated antitrust litigation.

10. Gulf's action of storing cartel documents in Canada amounts to a deliberate courting of the legal impediment to production of the documents.

11. Prior to promulgation of the Security Regulations, Gulf used the Ontario Business Records Act as a legal impediment to production of the withheld documents with respect to discovery requests in other litigation. Prior to September 23, 1976, there was no effective legal impediment which would have justifiably prevented production of the Canadian cartel documents in response to discovery requests.

12. Gulf is at fault in creating the dilemma of its present inability to fully comply with the discovery orders.

13. The withheld documents are relevant and crucial to a fair trial. Failure to produce the documents has deprived and prejudiced Exxon of a full and fair opportunity to cross-examine Gulf's witnesses; to defend against GAC's Complaint; to present its claims pleaded in its Counter-claim; and to rebut the defenses to its antitrust claims, particularly the affirmative defenses of Act of State and Sovereign Compulsion.

## VII. CHOICE OF SANCTIONS

Where a party "fails" to comply with a discovery order, the court "may make such orders in regard to the failure as are just." Rule 37(b), F.R.Civ.P. A wide spectrum of sanctions are provided for in Rule 37 ranging from an order awarding expenses and attorney's fees to the harsh sanctions of dismissal and default judgment. Other remedies include striking out portions of the pleadings, prohibiting the introduction of evidence on particular issues, and finding designated facts established adversely to the non-producing party.

The choice of sanctions must be carefully tailored to each case and must depend upon an evaluation of the nature of prejudice to the discovering party and the degree of fault of the non-producing party. *Wilson v. Volkswagen, supra,* 561 F.2d at 505. Imposition of the severe sanctions such as dismissal or default judgment require a finding of willfulness, bad faith, or fault, whereas the lesser sanctions may be predicated on an innocent failure to produce. *Societe Internationale v. Rogers, supra.*

Although the drastic sanctions sought by Exxon are not precluded here in view of the court's findings, their imposition should be reserved for extreme situations where lesser sanctions would be ineffective to cure the consequences of the discovery failure. See *Jones v. Louisiana State Bar Assoc.,* 602 F.2d 94, 97 (5th Cir. 1979). This approach is sound because dismissal and default judgment, the sanctions of last resort, run counter to the strong public policy of deciding cases on their merits and affording litigants their fair day in court. *Wilson v. Volkswagen, supra* at 504; *Richman v. General Motors,* 437 F.2d 196, 199 (1st Cir. 1971).

Upon a review of the entire record, the court concludes that dismissal of GAC's complaint and default judgment on Exxon's counterclaim is not appropriate because the court is able to fashion other sanctions and remedies to effectively redress the prejudice caused to Exxon by the absence of the withheld documents.

### Designated Facts Presumed

Although there are several cartel-related documents available to Exxon in presenting its claims and defenses, there is no doubt that Exxon's ability to prove the allegations in its counterclaim regarding the activities of the cartel has been seriously impaired by the absence of the withheld documents. Although a court is empowered by Rule 37(b)(2)(A) to order that designated facts relating to the missing evidence "be taken to be established" thereby foreclosing the non-producing party from proving otherwise, this court chooses to follow an approach taken in the case of *Alliance to End Repression v. Rochford*, 75 F.R.D. 438 (N.D. Ill.1976); namely, to deem designated facts presumed established subject to rebuttal by Gulf. In applying this sanction, we attempt to closely tailor the presumed facts to the withheld information to the extent possible.

### Preclusion of Evidence

The withheld documents relate intimately to Gulf's affirmative defenses of the act of state doctrine and sovereign compulsion.[24] The available evidence on the issues raised by these affirmative defenses is conflicting and ambiguous. Gulf's early strategy when it participated in the cartel in 1972 was to establish "sovereign compulsion" as the "fountainhead" of its antitrust defense (See DX 5145 at page 55). It assembled a war chest of documentary evidence in support of its sovereign compulsion defense while Exxon's best rebuttal evidence is likely secured in Canada among the 14,000 withheld documents.[25]

It is not possible to fairly litigate the issues raised by the act of state and sovereign compulsion defenses without the withheld cartel-related documents. A preclusion order prohibiting Gulf from supporting these affirmative defenses is commensurate with the nature of the prejudice to Exxon and appropriate in these circumstances. "[I]t is fundamental that a party that does not provide discovery cannot profit from its own failure. Thus Rule 37(b)(2)(C) recognizes that parties failing to comply with discovery requests may be estopped from 'support[ing] or oppos[ing] designated claims or defenses.'" *Dellums v. Powell*, 566 F.2d 231, 235 (D.C.Cir.1977). Preclusionary orders ensure that a party will not be able to profit from its own failure to comply. *Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062, 1066 (2nd Cir. 1979).

### Other Sanctions

An important factor in declining to impose harsher sanctions is the consideration that Exxon has some evidence available to utilize in the presentation of its claims. Most of the available evidence has been produced by Gulf from its U. S. offices and will be received in evidence without objection.

In addition, Exxon has certain cartel-related documents which were obtained from "Friends of the Earth" which may not be *actually* available to Exxon because of evidentiary problems.[26] An adequate showing of authenticity and other foundational requirements to overcome hearsay objections may not be possible. Gulf has not stipulated to admissibility and has preserved objections for trial. A particularly relevant F.O.E. document is the partial set of minutes of the Las Palmas meeting which bears on the critical issue of whether the cartel applied its minimum prices to the U. S.

24. See Part V, *supra*.

25. In its recent Motion for Partial Summary Judgment, Gulf contended that its available U. S. documents *conclusively* established the defense of sovereign compulsion. In support of its motion, Gulf submitted an appendix of 1100 pages of documentary evidence.

26. See page 305, *supra*.

uranium market. (DX 273). This and other "Friends of the Earth" documents must be made *effectively* available to Exxon by deeming them admissible in evidence as a partial remedy to overcome the prejudice caused by the absence of the withheld Canadian documents.[27]

In addition to the foregoing sanctions, reasonable expenses and attorneys fees in connection with the instant motion shall be recoverable by Exxon pursuant to Rule 37(b)(2)(E), F.R.Civ.P.

## VIII. CONCLUSION

Exxon's Motion for Dismissal of the Complaint and the Granting of a Default Judgment on Exxon's Counterclaim should be denied. However, sanctions pursuant to Rule 37(b), Federal Rules of Civil Procedure, are imposed against the counterclaim defendants as follows:

1. The following allegations in the Third Amended Counterclaims of Exxon shall be presumed true subject to rebuttal by counterclaim defendants: Count One, Paragraph 13(e)(f)(g)(h) and Paragraph 14 and Paragraph 15; Count Three, the portion of Paragraph 25(a) beginning on page 12 at line 2 through line 13. The counterclaim defendants shall have the burden to prove the non-existence of the above allegations;

2. Counterclaim defendants shall be precluded from presenting evidence at trial in support of the allegations contained in the 14th, 15th and 16th affirmative defenses (Paragraphs 63, 64 & 65) contained in the Answer of Gulf Oil Corporation to the Third Amended Counterclaims and Complaint. (Act of state and sovereign compulsion defenses)

3. The documents described as "Friends of the Earth" documents offered by Exxon in support of its claims and defenses shall be received in evidence at trial. Lack of evidence of authenticity or foundation shall be considered only as affecting the weight

of the evidence and shall not be a bar to the admissibility of said documents;

4. Costs and attorneys fees in connection with the instant motion are awarded to Exxon in an amount to be determined.

SO ORDERED.

## APPENDIX A

### URANIUM PRODUCER CARTEL PARTICIPANTS

#### (Other than Gulf)

Australian Group:
  E. Z. Industries, Ltd.
  Electrolytic Zinc Co.
  Mary Kathleen Uranium, Ltd.
  Noranda (Australia) Ltd.
  Noranda Exploration
  Pan-Continental Mining, Ltd.
  Peko-Wallsend
  Queensland Mines, Ltd.
  Western Mining Corp., Ltd.
  Australian Uranium Producers Forum

Canadian Group:
  Denison Mines, Ltd.
  Eldorado Nuclear, Ltd.
  Gulf Minerals Canada, Ltd.
  Rio Algom Mines, Ltd.
  Uranium Canada, Ltd.
  Noranda, Ltd.

French Group:
  URANEX
  Pechinez Ugine Kuhlman
  Compagnie de Mokta
  C. E. A. (Commissariat a l'Energie Atomique)

South African Group:
  NUFCOR

Rio Tinto Zinc, Ltd. (RTZ) and subsidiaries:
  Palabora
  Rossing Uranium, Ltd.
  Conzinc Rio Tinto of Australia
  RTZ Services, Inc.

---

27. It is arguable that some of the F.O.E. documents, such as the Las Palmas minutes (DX 273) may be admissible under the residual exception to the hearsay rule, Rule 803(24), *Federal Rules of Evidence.* Gulf apparently will refrain from objecting on authentication grounds (Gulf's Post Hearing Brief, p. 54).

# APPENDIX B

## CHRONOLOGICAL LIST OF CARTEL MEETINGS

| Place | Date | Gulf Attendees | Doc. or Int. Ref | Minutes Available |
|---|---|---|---|---|
| South Africa | 1/2/71 | None | DX 1736a, DX 2754, DX 2755 | No |
| Toronto | 7/6/71 | Ediger (Meeting with Runnalls) | DX 1055a, App. A to 6th Set Int. (DX 2795) | No |
| San Diego | 7/15–23/71 | Rolander (Visited by Runnalls in San Diego) | DX 608, 609, DX 610 | No |
| Paris (App. A to 6th Set Int. suggests mtg. place Geneva) | 9/15 & 17/71 | H. Holm & A. Graff (Meeting w/officials of Uranex) | DX 1473a, DX 1474, App. A to 6th Set Int. (DX 2795) | No |
| Ottawa | 12/8/71 | Ediger (Meeting with officials of EM&R) | DX 996, App. A to 6th Set Int. (DX 2795) | No |
| Paris | 2/1–4/72 | None | DX 14a, DX 1041a, App. A to 6th Set Int. (DX 2795) | No |
| * Ottawa | 2/16/72 | Ediger, Estey, Zagnoli (Zagnoli thinks Allen attended but Allen denies) | DX 16b, DX 19a, DX 17d, DX 165b, App. A to 6th Set Int. | No |
| Paris | 2/21–24/72 | No Gulf Attendees | DX 1002c, DX 20, DX 1044a, DX 18e, App. A to 6th Set Int. (DX 2795) | No |
| ** Canberra | 2/28/72 | No Gulf Attendees | DX 944, App. A to 6th Set Int. (DX 2795) | No |
| ** Sydney | 3/2/72 | No Gulf Attendees | DX 944, App. A to 6th Set Int. (DX 2795) | No |
| Paris | 3/12–13/72 | No Gulf Attendees | DX 952a, App. A to 6th Set of Int. (DX 2795) | No |
| * Toronto | 3/20 or 21/72 | Ediger & Estey | DX 1823, DX 1328, App. A to 6th Set of Int. (DX 2795) | No |
| * Ottawa | 4/10/72 | Estey, Ediger, Allen | DX24a, DX 1186, App. A to 6th Set Int. (DX 2795) | No |
| Paris (Canadian Producers and Int'l Producers) | 4/19–20/72 | Ediger, Estey, Allen Zagnoli (DX 1546 also suggests Hoffman) | DX 32b, DX 33d, DX 1414, DX 31d, DX 37e, DX 1006a, DX 1825, DX 1551a, App. A to 6th Set Int. (DX 2795) | DX 37e |
| * Ottawa | 5/9/72 | Ediger | DX 41a, DX 44a, DX 46a, DX 45, DX 40, DX 1831, App. A to 6th Set Int. (DX 2795) | DX 46a |
| * Johannesburg | 5/28/72 | Ediger, Hoffman, Allen, Hunter | DX 57d, DX 64a, DX 988b, App. A to 6th Set Int. (DX 2795) | DX 57d |
| Johannesburg (Operating Committee and Policy Committee Meetings) | 5/29–6/1/72 | Ediger & Hoffman | DX 51a, DX 59b, DX 1386, App. A to 6th Set Int. (DX 2795) | DX 1386 |

* Canadian Producer's Meeting
** Australian Producer's Meeting

| Place | Date | Gulf Attendees | Doc. or Int. Ref | Minutes Available |
|---|---|---|---|---|
| * Ottawa | 6/9/72 | Ediger | DX 51a, DX 1014, DX 54a, DX 59b, App. A to 6th Set Int. (DX 2795) | DX 59b |
| * Toronto | 6/28/72 | Ediger | DX 1013a, DX 63a, DX 1016, App. A to 6th Set Int. (DX 2795) | No |
| Cannes | 7/6–7/72 | Gulf not on operating committee, no attendees | DX 67c, DX 76, DX 1090c, App. A to 6th Set Int. (DX 2795) | DX 67c (Lowell's notes) |
| ** Sydney | 8/7/72 | No Gulf Attendees | DX 950a | No |
| * Ottawa | 9/5/72 | Ediger, Gregg, and Zagnoli | DX 1022, DX 1023, DX 100, DX 96b, DX 97e, DX 1067, App. A to 6th Set Int. (DX 2795) | DX 96b |
| Sydney | 10/2–4/72 | Possibly Gregg (but App. A to 6th Set Int. states no Gulf attendees) | DX 102a, DX 103a, App. A to 6th Set Int. (DX 2795) | No |
| Sydney | 11/1/72 | No Gulf Attendees (But DX 1021 suggests that Runnalls observed) | DX 1334a [Per App. A (DX 2795) Gulf and GAC do not know that such a mtg. occurred] | No |
| * Toronto | 11/16/72 | No Gulf Attendees | DX 1132 | No |
| * Toronto | 11/21–22/72 | Gregg recalls attending but not "details" | DX 131a App. A to 6th Set Int. (DX 2795) | No |
| * Ottawa | 1/8/73 | Ediger & Gregg | DX 1136a, DX 122a, 127a, App. A to 6th Set Int. (DX 2795) | No |
| Arosa | 1/25–27/73 | Apparently no Gulf attendees | DX 135c, DX 1146a, DX 1147b; App. A to 6th Set Int. (DX 2795) | No |
| Paris | 4/9–11/73 | Ediger, Gregg & Holm | DX 860a, DX 1621 DX 1173, DX 323 | No |
| * Paris | 4/10/73 | Ediger, Gregg & Holm | DX 323, DX 918, DX 1173a, DX 961, App. A to 6th Set Int. (DX 2795) | No |
| * Ottawa | 5/18/73 | Ediger | App. A to 6th Set Int. (DX 2795) | No |
| Johannesburg | 8/2–3/73 | "At least one" Gulf attendee not yet identified | DX 1199; App. A 6th Set Int. (DX 2795) | No |
| London | 10/5–9/73 (Operating Committee and Policy Committee Mtgs.) | Gregg, Ediger, & possibly Holm: 9/5/73 telex from Gregg to Holm states that "we [will] go into London meetings" (DX 1609) | DX 264, DX 474, DX 1612, DX 1453, DX 979a, App. A to 6th Set Int. (DX 2795) | DX 474 (Gulf disputes authenticity |
| * Ottawa | 11/7/73 | Ediger, Gregg & Boyce | DX 1217, DX 2093, DX 1218, App. A to 6th Set Int. (DX 2795) | No |

* Canadian Producer's Meeting
* Australian Producer's Meeting

| Place | Date | Gulf Attendees | Doc. or Int. Ref | Minutes Available |
|-------|------|----------------|------------------|-------------------|
| Las Palmas | 11/21–23/73 | Possibly Gregg & Holm: 11/7/73 Gregg telex advises Holm in advance of agenda for Las Palmas meeting (DX 1538); however, App. A to 6th Set Int. states no Gulf attendees | DX 273, DX 963, DX 1538, App. A to 6th Set Int. (DX 2795) | DX 273 (Gulf disputes authenticity) |
| * Ottawa | 12/7/73 | Ediger | DX 1983; App. A to 6th Set Int. (DX 2795) | No |
| * Toronto | 1/9/74 | Ediger | DX 1099b, DX 1233b | No |
| Johannesburg | 1/28–2/1/74 (Operating Committee and Policy Committee Mtgs.) | Gregg & Ediger | DX 285, DX 341b, DX 581b, DX 1099, DX 1994, DX 1707, DX 282c, DX 283a, DX 286 | No |
| * Ottawa | 2/18/74 | Ediger & Gregg | DX 1235b, DX 1540, App. A to 6th Set Int. (DX 2795) | No |
| Montbazon | 4/74 (Operating Committee) | Gregg | DX 306, DX 1478, App. A to 6th Set Int. (DX 2795) DX 2899 (p. 100016, 100120), [DX 292 "Clean Draft Rules" presented to this mtg.] | No |
| * [Unknown] | 4/11/74 | Information not provided | DX 2899 (p. 100130) | No |
| London | 5/74 | Gulf attendees not identified | DX 301b | No |
| * Ottawa | 5/9/74 | Ediger | App. A to 6th Set Int. (DX 2795) DX 2899 (p. 100129, 100130) | No |
| * Toronto (UCL's Office) | 7/12/74 | Gulf attendees not identified | DX 939a, App. A to 6th Set Int. (DX 2795) | No |
| Paris | 8/20/74 | Not identified | DX 2899 (p. 100130) | No |
| Paris | 9/9/74 (Operating & Policy Comm.) | Gulf attendees not identified | DX 2810, DX 2899 (p. 100016, 100029) | No |
| Ottawa | 10/9/74 | Gulf attendees not identified | DX 2810 | No |
| [Unknown] | 3/17/75 | Not identified | DX 2899 (p. 100003) | No |
| London | 3/23–29/75 (Operating & Policy Committees) | Gulf attendees never identified | DX 2811, DX 2899 (p. 100003) | No |
| Paris | 6/9–11/75 | Gulf attendees never identified | DX 2811 | No |
| * Ottawa or Toronto | 6/25/75 | No information provided | DX 2899 (p. 100129) | No |
| * Toronto | 10/17/75 | Janisch, Britt | DX 2119, DX 2899 (p. 100129) | DX 2119 |
| * Ottawa or Toronto | 12/19/75 | No information provided | DX 2899 (p. 100129) | No |

* Canadian Producer's Meeting