Robert SHAMIS, as Assignee of Wishbone Trading Company, Limited, a Hong Kong corporation, and Robert Shamis, Individually, Plaintiff,

v.

AMBASSADOR FACTORS CORPORA-TION, d/b/a Ambassador Factors, A Division of Fleet Factors Corp., A Rhode Island corporation, S. Roberts, Inc., a New York corporation, Christy Lynn, a New York corporation, ABC Companies (fictitious names of corporate affiliates of defendants S. Roberts, Inc. and Jay Vee, Inc. whose identities are presently unknown), Nathan Korman, a/k/a Lawrence Korman, Steven Pesner, as Executor of the Estate of Leonard Kaye, and Mahoney Cohen & Company, P.C., a New York professional corporation, Defendants.

No. 95 Civ. 9818(RWS).

United States District Court, S.D. New York.

Jan. 27, 1999.

Storch Amini & Munves, P.C., New York City (Steven G. Storch, of counsel), for plaintiff.

Ruskin, Moscou, Evans & Faltischek, P.C., Mineola, NY (Douglas J. Good, of counsel), for defendant Ambassador Factors Corp.

Schaeffer & Zapson LLP, New York City (Elliott L. Schaeffer, Lance N. Olitt, of counsel), for defendants S. Roberts, Inc., Jay Vee, Inc., Christy Lynn and Nathan Korman.

Strassberg & Strassberg, P.C., New York City (Louis Strassberg, of counsel), for defendant Mahoney Cohen, Rashba & Pokart.

*OPINION*

SWEET, District Judge.

Defendant Ambassador Factors Corporation ("Ambassador"), defendants S. Roberts, Inc. ("Roberts"), Christy Lynn, Inc. ("Christy"), Angela Christy, Inc. ("Angela"), Jay Vee, Inc. ("Jay Vee") and Nathan L. Korman ("Korman" and collectively "The Roberts Defendants") and defendant Mahoney Cohen Rashba Pokart and Company ("Mahoney Cohen") (collectively, the "Defendants") have moved to dismiss this action, pursuant to Fed.R.Civ.P. 37, based on plaintiff Robert Shamis' ("Shamis") alleged discovery abuses, or, in the alternative, for sanctions.

The Roberts Defendants, pursuant to Fed.R.Civ.P. 56, move for summary judgment dismissing Shamis' Sixth Claim[1] for relief against Korman, and dismissing Shamis' Seventh and Eighth Claims for Relief against Angela and Christy.[2]

For the reasons set forth below, Defendants' motion to dismiss is denied. The Roberts Defendants motion for summary judgment is granted in part and denied in part.

**The Parties**

Plaintiff Shamis is a citizen of Israel and a British national, and at all times relevant to this action, was a shareholder, officer and director of Wishbone. Shamis is Wishbone's assignee.

Wishbone was a Hong Kong-based apparel exporter that shipped goods primarily to the United States. In December 1993, Wishbone was placed in receivership and ultimately liquidated in accordance with Hong Kong law.

Defendant Roberts is a New York-based wholesale distributor of women's dresses.

Defendants Jay Vee, Inc., Angela, Christy Lynn and ABC Companies are successor corporate entities of Roberts.

---

1. These claims refer to plaintiff's second amended complaint (the "Second Amended Complaint") filed on March 4, 1998.

2. Korman, Christy and Roberts in their reply papers asked the Court to grant summary judgment to Jay Vee as well, even though that entity had not moved for summary judgment. By letter to the Court dated November 16, 1998 from counsel for all of these defendants, this request was withdrawn.

Defendant Korman was an officer and a 60% stockholder of Roberts.

Defendant Ambassador is a Rhode Island corporation that provides account receivable factoring services between importers and distributors in the garment industry.

Defendant Mahoney Cohen is a New York-based accounting company that performs private and public accounting, as well as related consulting and auditing services.

### Prior Proceedings

On November 20, 1995, Shamis filed his initial complaint (the "Complaint") which alleged eleven causes of action against the above named defendants. On February 28, 1996, Shamis filed an amended complaint (the "Amended Complaint"), pursuant to Fed.R.Civ .P. 15(a), substituting Steven Pesner ("Pesner") as a defendant for Leonard Kaye ("Kaye").[3]

On March 21, 1996, Ambassador moved pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Complaint for failure to state a claim upon which relief can be granted and failure to plead fraud with particularity, pursuant to Fed.R.Civ.P. 9(b). By opinion and order dated August 12, 1996, Ambassador's motion was denied. *See Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818, 1996 WL 457320 (S.D.N.Y. August 14, 1996).

On May 13, 1997, Shamis filed a motion for leave to file a second amended complaint and thereby sought, among other things, to add a fraud claim against Mahoney Cohen and two RICO claims against Roberts, Ambassador, Korman, Jay Vee, and Mahoney Cohen. The Roberts Defendants cross-moved to dismiss the entire action. By opinion and order dated August 15, 1997, the Court granted the motion to dismiss, denied Shamis' motion to amend the complaint, and granted Shamis leave to replead the state law claims upon a showing that the receivers were citizens of a foreign state recognized by the United States Department of State. *See Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818, 1997 WL 473577 (S.D.N.Y. August 18, 1997).

3. Kaye was an officer and 40% stockholder of Roberts. Kaye died in 1995, and defendant Pesner was appointed executor of his estate by the

On October 10, 1997, Shamis filed a motion to vacate the judgment dismissing his Complaint, and for leave to file a second amended complaint, adding two state law claims: (1) common law fraud against Mahoney Cohen; and (2) breach of contract against Ambassador. By opinion and order dated February 20, 1998, the Court granted the motion to vacate and granted leave to file the proposed second amended complaint. *See Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818, 1998 WL 75828 (S.D.N.Y. February 20, 1998). Shamis filed his Second Amended Complaint on March 4, 1998, alleging claims against the various defendants based upon fraud, breach of contract, breach of implied covenant of good faith, goods sold and delivered, fraudulent conveyance, successor liability and third party beneficiary.

On September 4, 1998, Ambassador moved to dismiss this action pursuant to Fed. R.Civ.P. 37. On September 15, 1998 Mahoney Cohen filed its motion to dismiss. The Roberts Defendants filed their motion to dismiss on September 23, 1998. Oral argument was heard on November 4, 1998, at which time leave was granted to all parties to file additional submissions. Additional papers were received through December 22, 1998, at which time the motions were deemed fully submitted.

### Facts

#### I. *Historical Background*

In 1986, Korman controlled and operated a garment wholesaler known as El Jay. Shamis alleges that Korman, on behalf of El Jay, received financing from Manufacturers Hanover Bank (the "Bank"), which was secured by El Jay's receivables and inventory. According to Shamis, although the financing arrangement allowed El Jay to borrow against receivables only after product was shipped to a customer, El Jay nevertheless submitted invoices to the Bank for goods that had not been ordered and/or shipped to customers. Shamis claims that the Bank learned of this fraudulent practice, and began recouping the advances it had paid to El Jay.

Surrogate's Court of New York County on or about March 30, 1995.

The Bank's recoupments contributed to El Jay filing a Chapter 11 bankruptcy petition in early 1987.

## II. The Roberts/Ambassador Relationship

According to Shamis, Ambassador was first introduced to Korman when, pursuant to a court order, the company was appointed to be the factor for El Jay as debtor-in-possession. Furthermore, Shamis alleges that when Ambassador undertook this assignment, Ambassador learned about Korman and El Jay's fraudulent "pre-invoicing" practice.

On August 26, 1988, Roberts and Ambassador entered into a written agreement (the "Factoring Agreement") in which Roberts appointed Ambassador as its exclusive factor of all accounts receivable that resulted from Roberts' sales of finished goods to various retailers. In exchange, Ambassador received, among other things, a percentage commission, and security interests in both Roberts' accounts receivable and some of Roberts' inventory.

## III. The Roberts/Ambassador/Wishbone Relationship

In 1988, Korman was introduced to Shamis and the two began discussions about a business arrangement pursuant to which Wishbone would manufacture clothing for Roberts. On October 27, 1989, Roberts and Wishbone entered into a three-year agreement (the "Master Agreement"), in which Roberts appointed Wishbone as its exclusive purchasing agent for all of its finished goods manufactured in the Far East, Turkey, India and elsewhere. The Master Agreement established that Wishbone would finance Roberts' inventory purchases by extending letters of credit to merchandise suppliers. Wishbone also agreed to provide certain support services with those suppliers on Roberts' behalf. In return, Roberts granted Wishbone (1) security interests in Roberts' inventory, accounts receivable and other assets; (2) a six percent commission on the value of goods imported through Wishbone

and a three percent commission on all sums which it financed on Roberts' behalf; and (3) an assignment of 50% of the payments made by Ambassador to Roberts under the Factoring Agreement.

To establish a payment mechanism for Roberts' obligations to Wishbone under the Master Agreement, Ambassador and Roberts then entered into a written agreement, dated November 20, 1989 (the "Assignment of Factoring Proceeds Agreement"), which provided that Ambassador would pay directly to Wishbone one-half of the 80% of the accounts receivable payments which otherwise would have been paid to Roberts under the Factoring Agreement. This Agreement further provided that Ambassador would subordinate its security interest under the Factoring Agreement to Wishbone's security interest under the Master Agreement with respect to inventory and receivables that would arise from the sale of the inventory that Wishbone had supplied and/or financed.

Shamis claims that the Factoring Agreement specifically provided that any receivable sold to Ambassador would be accompanied by proof of delivery of the underlying goods to the customer in order to eliminate the possibility that Korman and Roberts would repeat the fraudulent invoicing scheme allegedly perpetrated by El Jay.

According to Shamis, Wishbone supplied Roberts with finished goods until approximately June 1991, at which time Roberts's debt to Wishbone had reached approximately $20,000,000.

## IV. The Alleged Fraud

Shamis alleges that in April 1992, ten months after its final shipment of goods to Roberts, Wishbone discovered that Roberts had fraudulently pre-invoiced, in violation of the Factoring Agreement.[4]

Shamis further alleges that Ambassador was aware by early 1991 that Roberts was pre-invoicing, but nevertheless continued to purchase all Roberts's receivables without demanding the required proof of shipment

4. Shamis' Second Amended Complaint also alleges "phony invoicing," a practice where pur- ported receivables do not reflect an actual order placed by a customer.

and delivery. In April 1991, Ambassador charged back to Roberts' account approximately $1.7 million in receivables and thereafter substituted a "cash basis" manner of payment for the receivables, whereby it withheld payment of funds to Roberts until it had proof that a retail customer had paid a given invoice.

According to Shamis, Ambassador, motivated by its desire to avert a default by Roberts, intentionally failed to notify Wishbone of the problems connected with the Factoring Agreement. By continuing to pay Wishbone its 50% share of the receivables pursuant to the Assignment of Factoring Proceeds Agreement, Ambassador "lulled Wishbone into a false sense of security." Had Shamis been aware of the improprieties, it would have ceased shipping goods to Roberts on credit and would have exercised its rights under both the Master Agreement and the Assignment of Factoring Proceeds Agreement to foreclose on its security interests.

### V. *Mahoney Cohen's Audit of Roberts*

Shamis alleges that in September 1990, Wishbone determined that it needed independent accountants to audit Roberts' books. Shamis recommended to Roberts that it engage the accounting firm of Mahoney Cohen to audit Roberts. Roberts retained Mahoney Cohen shortly thereafter to audit the nine-month period ending September 30, 1990. Shamis claims that in the course of performing audit due diligence, Mahoney Cohen became apprised of Korman's pre-invoicing conduct at El Jay. Shamis further alleges that Mahoney Cohen found a large quantity of inventory in a warehouse for which invoices had been written-up, and for which funds allegedly had been advanced without proof of shipment. According to Shamis, Mahoney Cohen realized Roberts' fraudulent activity and discussed it with Korman. Although Korman immediately shipped the goods, further examination of Roberts' books and records by Mahoney Cohen revealed that Roberts had incorrectly recorded the completed sales in its books.

Shamis asserts that Mahoney Cohen failed to take proper action upon discovering the fraudulent activity; Mahoney Cohen neither resigned the account, alerted Wishbone to the existence of the allegedly fraudulent practices, nor recommended that Roberts adjust its income in accordance with generally accepted accounting principles, which would have reflected a loss for 1990. Shamis claims that Mahoney Cohen then mailed the misleading financial statement to Wishbone in Hong Kong, in order to "defraud Wishbone into extending further credit to Roberts and forbearing from foreclosing on its various security interests." Shamis contends that Wishbone thereafter extended additional credit to Roberts in reliance upon the statement prepared by Mahoney Cohen.

Furthermore, Shamis contends that Mahoney Cohen discussed with Korman the creation of a separate company, Jay Vee, which would be formed for the purpose of avoiding the debt to Wishbone by taking over Roberts' business and entering into a new factoring agreement with Ambassador. This new arrangement would bypass the Assignment of Factoring Proceeds Agreement that had been entered into with Wishbone.

### VI. *The Creation of Jay Vee*

Jay Vee was formed in or shortly before July 1991. Shamis asserts that Jay Vee acted as the "alter ego" of Roberts and that Ambassador began factoring for it shortly after its inception. Shamis also asserts that, at about this time, Korman made assurances to Wishbone that Roberts' debt to Wishbone would be fully repaid, and thereafter sent additional false statements to Wishbone.

Shamis contends that Korman, Jay Vee, and Ambassador all benefitted from this new arrangement, while Wishbone suffered. For Korman and Jay Vee, funds that previously would have been sent from Ambassador to Wishbone could now be paid directly to them. In this way, Ambassador reduced its risk that Roberts would be unable to repay its debt if Ambassador could not collect the factored receivables. Shamis claims that Ambassador, Korman and Mahoney Cohen all understood the implications of this new arrangement and went along with the fraud. According to Shamis, Wishbone continued to receive partial but insufficient payments

from Ambassador until October 1992, the purpose of which was to keep Wishbone's suspicions at bay.

## VII. *The Alleged Continuing Pattern of Fraud*

According to Shamis, by the summer of 1992, Jay Vee had disposed of most of Wishbone's inventory and was in need of new sources of goods and therefore, financing. To achieve these ends, Korman allegedly targeted an individual named Lampert, and persuaded Lampert to invest $4.1 million in Jay Vee. Shamis asserts that Jay Vee once again engaged in phony invoicing and never repaid Lampert. Ultimately, Jay Vee splintered into entities named Angela, Christy Lynn, and ABC.

## *Discussion*

### I. *Defendants' Motion to Dismiss This Action is Denied*

Defendants contend that Shamis has engaged in a "pattern of intentional activities designed to defeat and frustrate [Defendant's] attempts to obtain discovery," and has thereby substantially impaired their ability to defend themselves at trial. Good Aff. ¶ 51. Defendants allege that Shamis has obstructed discovery in this case in the following ways: (i) Shamis had notice of the imminent destruction of Wishbone's business records in the possession of Wishbone's Receiver, but permitted all but a select number of documents to be destroyed, without any notice to Defendants or the Court; (ii) Shamis failed to obtain a waiver of Hong Kong Bank Secrecy Laws from Wishbone's receivers, despite a Court Order expressly directing him to do so; (iii) Shamis was directed by the Court to bear certain costs associated with deposing Wishbone's Provisional Receivers, Gabriel C.K. Tam and N.P. Etches, and thwarted that order by canceling the depositions; (iv) Shamis caused BankBoston to deliver to him documents subpoenaed by Ambassador, and asserted unwarranted privilege claims to these nonparty documents; and (v) Shamis failed to answer Ambassador's Second Set of Interrogatories, and instead "asserted spurious objections to each and every interrogatory." (Ambassador's Brief at 1). Defendants

maintain that this "pattern of discovery abuse" warrants the sanction of dismissal pursuant to Rule 37(d).

### A. *Defendants' Motion is Timely*

■ As a preliminary matter, Shamis maintains that Defendants have failed to meet their burden, as parties seeking discovery, to bring any perceived deficiencies in his compliance with discovery requests and orders to the Court's attention in a timely fashion. Shamis notes that during the long and contentious discovery in this action, Defendants never raised before the Court the abuses which they now claim existed. Thus, Shamis asserts that the discovery violations alleged by Defendants here should be deemed waived.

Defendants contend that their motion is timely, having been brought promptly at the close of discovery as it was only then apparent that the obstructed discovery could not be obtained from other sources.

While Rule 37 does not establish any time limits within which a motion for sanctions must be filed, unreasonable delay may render such motions untimely. *See e.g., Brandt v. Vulcan, Inc.,* 30 F.3d 752, 757 (7th Cir. 1994) (unreasonable delay rendered motion for sanctions untimely where plaintiff had notice of Defendant's possible discovery abuses years before, but "let the matter rest.") However, unlike the cases relied upon by Shamis, here the motion for sanctions was not brought well after the close of discovery, *see Glenn v. Scott Paper Co.,* 1993 WL 431161, 1993 U.S.Dist. LEXIS 14966 (D.N.J. October 20, 1993), nor after the start of trial, *see e.g., Clinchfield R. Co. v. Lynch,* 700 F.2d 126, 132 (4th Cir.1983); *Ali v. A & G Co.,* 542 F.2d 595, 596 (2d Cir.1976), but soon after the close of discovery. The deadline for discovery in this case was June 30, 1998. Ambassador filed its Rule 37 motion on September 4, 1998. While it may have been advisable for Defendants to have raised before the court Shamis's alleged lack of cooperation in discovery earlier, its failure to do so does not constitute unreasonable delay. Accordingly, Defendants' motion is timely.

## B. *Standard for Sanctions*

Rule 37(d), as amended on December 1, 1993, provides that if a party: 1) fails to appear to testify at a deposition after being served with a proper notice, 2) fails to serve answers or objections to interrogatories submitted under Rule 33, after proper service thereof, or 3) fails to serve a written response to a request for inspection submitted under Rule 34, after proper service thereof, the Court may make such orders in regard to the failure as are just, including the imposition of any sanction authorized under Rule 37(b)(2)(A), (B), and (C). Fed.R.Civ.P 37(d).

Those subdivisions of Rule 37(b) provide, respectively, that the Court may: A) order that the matters regarding which order made or any other designated facts be deemed established for the purposes of the action in accordance with the claim of the party obtaining the order; B) preclude the disobedient party from supporting or opposing the claims or defenses, or from introducing designated matters in evidence; or C) strike out pleadings or parts thereof; stay further proceedings until the order is obeyed, dismiss the action or any part thereof, or render a judgment by default against the disobedient party. Fed.R.Civ.P. 37(d).

 It is well settled law in this Circuit that the sanction of dismissal sought by Defendants here "is a drastic penalty which should be imposed only in extreme circumstances." *Salahuddin v. Harris*, 782 F.2d 1127 (2d Cir.1986) (quoting *Israel Aircraft Indus., Ltd. v. Standard Precision*, 559 F.2d 203, 208 (2d Cir.1977)). Accordingly, this "harsh remedy" is appropriate only when a court finds "willfulness, bad faith, or any fault on the part" of the plaintiff. *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir.1994) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990)). In addition to a finding that Shamis acted willfully or in bad faith, employing dismissal as a sanction requires findings that (1) Defendants were seriously prejudiced by Shamis' actions; and (2) that alternative sanctions would not adequately punish Shamis and deter future discovery violations. *See Computer Associates International, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 169 (D.Co.1990); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D.Fla.1987).

A wide spectrum of sanctions are provided for by Rule 37. The appropriateness of a given sanction is not guided by any clearly defined rule or doctrine but should be just, in accordance with the terms of Rule 37(d), and should serve the guidelines outlined in *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67 (2d Cir.1988); *Williams v. National Housing Exchange Inc.*, 165 F.R.D. 405, 408 (S.D.N.Y.1996). *Update Art* outlined three purposes of Rule 37 sanctions: (1) they insure that a party will not benefit from failure to comply with discovery requests, (2) they are specific deterrents in a case to a particular party, and (3) they have "a general deterrent effect on the case at hand and on other litigation...." *Id.* (citing *Update Art*, 843 F.2d at 71).

 The choice of sanctions must be carefully tailored to each case and must depend upon an evaluation of the nature of prejudice to the discovering party and the degree of fault of the non-producing party. *See Wilson v. Volkswagen of America, Inc.* 561 F.2d 494, 504 (4th Cir.1977). Whereas imposition of severe sanctions such as dismissal require a finding of willfulness, bad faith, or fault, the lesser sanctions may be predicated on innocent failure to produce. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

 Shamis contends that sanctions may be imposed pursuant to Rule 37(b)(2) only for failure to obey a court order. Shamis maintains that in the absence of an express discovery order on the precise subject of the dispute, sanctions under Rule 37(b) are precluded. While the plain language of Fed. R.Civ.P. 37(b) limits its applicability to situations where a discovery order has been violated, *see Salahuddin*, 782 F.2d at 1131; *Israel Aircraft*, 559 F.2d at 208; *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir.1991), conduct ordinarily sanctionable under Rule 37, but which falls outside the express terms of the rule, "can be sanctioned by proper exercise of this court's

inherent powers." *ABC Home Health Servs. Inc. v. Int'l Business Mach. Corp.,* 158 F.R.D. 180, 182 (S.D.Ga.1994) (quoting *E.E.O.C. v. Jacksonville Shipyards, Inc.,* 690 F.Supp. 995, 997 (S.D.Fla.1988)). Indeed, this Court possesses an inherent power to sanction litigants for abusive litigation practices that are taken in bad faith. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

### C. *Application of the Legal Standard*

Upon review of the entire record, the extreme sanction of dismissal of this action is not appropriate. Any prejudice caused to Defendants by discovery abuses can be effectively redressed by other sanctions and remedies.

#### 1. *Wishbone's Business and Financial Documents*

■ Defendants assert that after commencing this litigation, Shamis "permitted" the destruction of over 3,000 cartons of Wishbone's business and financial documents that were in the possession of its official receiver in Hong Kong (the "Official Receiver"). Shamis testified that he was advised by the Official Receiver that the documents were going to be destroyed. (Shamis Tr. at 648). Shamis was given an opportunity to review and obtain copies of the Wishbone documents and selected a number for his own use. (Shamis Tr. at 414–16) Shamis advised his counsel that the documents were going to be destroyed, but neither Shamis nor his counsel advised the Defendants or the Court that the documents were going to be destroyed. (Shamis Tr. at 193; Good Aff. ¶ 22).

Although Shamis has not identified the precise documents that were destroyed, Defendants contend that there are "numerous categories of relevant documents that any business such as Wishbone would have generated as a matter of course, that no longer

exist." (Defendant's Brief at 7).[5] These documents related to Wishbone's business, assets, transactions and relationship with the Defendants. Defendants maintain that the destroyed documents "surely contained material evidence not only concerning Ambassador's and other defendants' defense against plaintiff's damage claim, but also concerning substantive issues of liability." (Defendant's Brief at 7–8). Thus, Defendants claim that they were prejudiced by the destruction of these documents during the course of this litigation.

Shamis asserts that he did not "permit" the destruction of any documents. Rather, he claims that the documents in question were disposed of at the direction of the Official Receiver, an independent government employee, who apparently ordered their destruction to save storage charges. According to Shamis, he neither initiated the destruction nor was in a position to prevent it.

■ It is well settled that the Court has the inherent power to sanction a party that destroys relevant and discoverable evidence. *See Donato v. Fitzgibbons,* 172 F.R.D. 75, 81 (S.D.N.Y.1997); *Shaffer v. RWP Group, Inc.,* 169 F.R.D. 19, 24 (E.D.N.Y.1996); *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991), *aff'd,* 1992 WL 51570 (S.D.N.Y. March 9, 1992). The Court's authority to impose sanctions derives from two sources—Federal Rule of Civil Procedure 37(b) and a court's "inherent power to regulate litigation, preserve and protect the integrity of the proceedings before it, and sanction parties for abusive practices." *Turner,* 142 F.R.D. at 72.

■ In determining whether to impose sanctions for spoilation of evidence, the court must initially determine whether the party had any obligation to preserve the evidence. A condition precedent to the imposition of sanctions is whether Shamis knew or should have known that the destroyed evidence was

---

5. These documents include: books of account, including general ledgers, cash receipt journals; documents concerning advances, guarantees or other extensions of credit made by Wishbone to S. Roberts, including letters of credit, wire transfers, invoices and due diligence and credit files; documents concerning S. Roberts' accounts receivable, including invoices, receipts, purchase orders, commission statements, aging reports; and documents concerning purported security interests Wishbone claims it held.

relevant to pending, imminent or reasonably foreseeable litigation. *See Shaffer v. RWP Group*, 169 F.R.D. at 24. Even when a party has not served a formal document request, "the complaint itself may alert a party that certain information is relevant and likely to be sought in discovery." *Turner*, 142 F.R.D. at 73.

Defendants maintain that Shamis had a duty to preserve the evidence. Defendants cite *Wm. T. Thompson Co. v. General Nutrition Corporation Inc.*, 593 F.Supp. 1443 (C.D.Ca.1984), for the proposition that "[w]hile a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." 593 F.Supp. at 1455. In *Thompson*, the court entered a default judgment against defendants who "knowingly and purposefully" permitted their employees to destroy key documents and records in defiance of a court order. In the instant case, unlike in *Thompson*, Shamis did not have or exercise control over the Official Receiver nor were the documents in his possession. He was not, as Defendants maintain, "as fully accountable as if he destroyed .the documents himself." (Defendant's Brief at 7).[6]

It is unclear whether Shamis could have prevented the documents from being destroyed. What is clear, however, is that Shamis could have informed the Defendants and this Court that the documents were about to be destroyed. Shamis commenced this action in November of 1995. The documents were destroyed in early 1996. Given that the litigation was pending at the time of the destruction, and the volume of documents to be destroyed, Shamis was on notice that the documents were arguably relevant and discoverable. Had Shamis notified the Defendants, they would have had the same opportunity to review and copy the documents

(and/or inventory) prior to the destruction. Thus, while Shamis' actions and/or inaction does not rise to the level of wilfulness or bad faith, he is not without accountability here.

▪ Having found that Shamis did not take the appropriate steps to "preserve" the documents in this case, it must be determined whether the destroyed evidence would have been "of the nature alleged by the party affected by its destruction." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998). "In weighing and determining the appropriateness and severity of sanctions, judges should examine the materiality and value of the suppressed evidence upon the ability of a [party] to fully and fairly prepare for trial." *Shaffer*, 169 F.R.D. at 26 (quoting *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 167 F.R.D. 90, 104 (D.Colo.1996)). This inquiry is "part of our attempt to place the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party." *Kronisch* 150 F.3d at 127. While some showing that the destroyed evidence would have been relevant to the contested issue(s) is required, "care should be taken" not to require too specific a level of proof. *Id.* at 127–28 (quoting 2 Wigmore, *Evidence in Trials at Common Law* § 291, at 228).

Defendants claim that they have been irreparably damaged in their ability to defend this case. As noted, Shamis has asserted various causes of action based upon: fraud, breach of contract, breach of implied covenant of good faith, goods sold and delivered, fraudulent conveyance, successor liability and third party beneficiary. It is Defendants' position, *inter alia*, that Wishbone's failure can be attributed to numerous causes, including its own mismanagement, its improvident investments in other companies, its relationship with companies related to Wishbone or Shamis, and its inability to collect on debts owed it by others. (*See* Good Reply Aff. ¶ 21). Accordingly, Defendants maintain that Wishbone's financial books, business records and its documentation relating to transac-

---

6. *Computer Associates International, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166 (D.Colo. 1990) on which Defendants rely, is also inapposite. In *Computer Associates,* the court found that the defendant intentionally destroyed evidence after the obligation to preserve it arose and after defendant had clear notice of that obligation. That is not the case here.

tions with the Defendants, are therefore highly probative of issues relating to both liability and damages.

Shamis does not contend that the destroyed documents are irrelevant, rather he claims that Defendants currently possess enough information to enable them to address liability and damages. The copies Shamis had made of documents that pertained to S. Roberts have all been produced in discovery. Shamis maintains that these are the documents that bear upon the relation between Wishbone and Roberts and thus, upon the transactions from which all the claims of liability arise. Shamis avers that the documents that were destroyed were not "unique," but were rather basic commercial documents pertaining to Wishbone's relations with other customers, or with suppliers, shippers and lenders. Furthermore, Shamis maintains that to the extent that such documents contained any of the raw data that would be incorporated into any overall analysis of Wishbone's finances, it was produced to Defendants from other sources in this litigation.

Given Shamis' admissions that 3,000 cartons of business documents and documents relating to Wishbone's other customers, suppliers, and lenders were destroyed, his assertion that "virtually all categories" of documents are available elsewhere seems improbable. Shamis' contention that the "relevant" documents were copied and produced is also unavailing. Indeed, a determination of what is and is not relevant varies substantially based on the parties' different theories of the case. Here, since Shamis' suit claims damages based on the failure of Wishbone in its entirety, and not just the money purportedly owed by Roberts, document production limited only to documents between Wishbone and Roberts is insufficient. Moreover, although the parties dispute the quantity and quality of production from other sources, there re-

main gaps in the discovery produced in this case.

Arguably, the destroyed documents in the instant case, of which Defendants remain deprived, are not only relevant and bear directly upon the issues of damages and liability, but also would have been offered into evidence. Accordingly, the Defendants may be entitled to a jury instruction explaining that destroyed documents are presumed to be damaging to the party responsible for destruction.[7] Such an "adverse inference charge" serves two purposes—remediation and punishment. *See Shaffer,* 169 F.R.D. at 25; *Turner,* 142 F.R.D. at 74. The remedial purpose of the sanction serves to place the prejudiced party in the same position with regard to its ability to prove its case as it would have been if the evidence had not been destroyed. *See Id.* The punitive purpose both deters parties from destruction of relevant evidence and directly punishes the party responsible for spoilation. *See Id.* The strength of the adverse inference instruction given to the jury "will vary according to the facts and evidentiary posture of a given case." *Welsh v. United States,* 844 F.2d 1239, 1247 (6th Cir.1988). To the extent that relevant documents that were destroyed cannot or have not be reproduced, the jury will be permitted to infer from the unavailability of these documents that they would have been unfavorable to Shamis. *See e.g., Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148 (1st Cir.1996); *Donato v. Fitzgibbons,* 172 F.R.D. 75; *Shaffer v. RWP Group,* 169 F.R.D. 19 (E.D.N.Y.1996); *Alliance to End Repression v. Rochford,* 75 F.R.D. 438 (N.D.Ill.1976); *General Atomic Co. v. Exxon Nuclear Co., Inc.,* 90 F.R.D. 290 (S.D.Cal.1981). However, Shamis will remain free at trial to proffer an explanation for the missing documents.

## 2. *Waiver of the Hong Kong Bank Secrecy Laws*

By Order dated February 27, 1997, this Court held:

> can be no doubt that the same basic principle ... applies. That is, the prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." *Kronisch* 150 F.3d at 128.

---

7. Shamis notes that Defendants fail to specify what documents of any alleged relevance are missing. However, where, as here, "a party loses the opportunity to identify such a particular document or documents likely to contain critical evidence because the voluminous files that might contain the document(s) have all been destroyed, the situation becomes more complex—but there

8. Shamis shall, upon the request of any party, the Provisional Receiver, Appropriate Authority or any entity listed in Paragraphs 5, 6 and 7 from which Ambassador has sought non-party discovery, execute and provide to the person or entity making the request, or to such other person, entity or governmental authority as the requestor may designate, such waivers, authorizations, consent or documents of like tenor as may reasonably be required to effectuate any waiver of Hong Kong's bank secrecy laws as they may apply to discovery sought by Ambassador ...

On March 7, 1997, Plaintiff's counsel wrote to the Provisional Receivers and requested a waiver. The Provisional Receiver responded that the waiver had to be obtained from the Official Receiver. Accordingly, plaintiff's counsel sent a formal request to the Official Receiver on March 24, 1997. On July 17, 1997, plaintiff's counsel informed counsel for Ambassador that the Official Receiver conditioned issuance of a waiver upon plaintiff's agreement to indemnify him from any claims that might result from a grant of the waiver. Shamis refused to provide the indemnification required by the Official Receiver.

■ Shamis maintains that pursuant to the February 27, 1997, Order, he is simply required to provide the Official Receiver with a written request that it waive to the same non-party entities any rights they might have had under the Hong Kong Bank Secrecy Laws concerning Wishbone. Shamis asserts that the Order cannot reasonably be read to comprise indemnification, particularly since he does not know for what potential liability, if any, he might be called upon to indemnify the Official Receiver.

Shamis has underestimated what was required by this Court's Order. The burden of complying with this Court's instruction to obtain a waiver falls on Shamis. *See Graco, Inc. v. Kremlin Inc.*, 101 F.R.D. 503, 527 (N.D.Ill.1984) (the foreign statute interfering with discovery was not the "problem" of either the court or the party seeking discovery; it was the "problem" of the party whose documents were shielded from discovery by foreign laws). Regardless of the risk of potential claims against him, Shamis is ob-

ligated to obtain a waiver from the Official Receiver. *See Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 (S.D.N.Y.1984) (Plaintiff was directed to make the demanded production, even though it placed plaintiff at a risk of being prosecuted under foreign law).

Accordingly, Shamis is ordered to provide an indemnification to the Official Receiver in order to obtain the waiver he was previously ordered to furnish. A failure to provide an indemnification will be sanctionable and may result in dismissal or preclusion of evidence and testimony. *See Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (good faith of the party resisting discovery is a key factor in the decision whether to impose sanctions when foreign law prohibits the requested disclosure).

### 3. *The Hong Kong Depositions*

■ On July 17, 1997, Shamis served notices of deposition of various individuals, including the Provisional Receivers appointed to oversee the liquidation of Wishbone, Gabriel C.K. Tam and N.P, Etches (the "Provisional Receivers"). By order dated August 7, 1997, this Court ordered Shamis to pay Defendants' fees and travel expenses relating to the out-of-state depositions. Shamis subsequently canceled the depositions. In a letter dated May 26, 1998, Shamis advised Korman's counsel that he intended to call the Provisional Receivers at trial.

Shamis maintains that the Court did not order him to proceed with the depositions. Defendants counter that the order was unambiguous and that Shamis was not entitled to circumvent it by unilaterally canceling the depositions.

The depositions in dispute were of the purported assignors of the claims asserted by Shamis in this action. The Professional Receivers likely possess information regarding issues of this case, such as plaintiff's claim that Wishbone was "out of ratio" with its lenders, *see* Second Amended Complaint ¶¶ 98, 103, 114, 118 and 125, and the value of the assets that the Provisional Receivers themselves liquidated. In light of the de-

stroyed documents, there is arguably a greater need for these depositions. *See Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) (In requiring plaintiff to obtain documents from its assignor, the court noted that "it would be patently unfair if [plaintiff-assignee] were able to continue to discover relevant information from [defendant] while relegating [defendant] to seek information from [the assignor] as a non-party").

Accordingly, if Defendants choose to depose the Provisional Receivers, Shamis will be required to pay the travel expenses of defense counsel and reasonable counsel fees for travel time.

### 4. *The BankBoston Documents*

■ On or about January 24, 1997, Ambassador subpoenaed BankBoston to provide testimony and produce documents related to this action. In response, BankBoston produced many documents, but also produced a document entitled "Privilege Log Bank of Boston Production" (the "Privilege Log"). Subsequently, BankBoston delivered all of the withheld documents to plaintiff's counsel and advised Ambassador's counsel to seek their production from plaintiff's counsel. Shamis has not turned over the documents and seemingly asserts a claim of "common interest" privilege.

Because this is a diversity case, New York law governs privilege issues. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y.1993); *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 443 (S.D.N.Y.1990). Although New York has enacted a statute defining the attorney-client privilege, N.Y.C.P.L.R. § 4503, the New York Court of Appeals has described the statue as a " 'mere re-enactment of the common law rule.' " *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 581 N.E.2d 1055, 1060, 78 N.Y.2d 371, 377, 575 N.Y.S.2d 809, 814 (1991) (quoting *Hurlburt v. Hurlburt*, 28 N.E. 651, 652, 128 N.Y. 420, 424 (1891)). Thus, "New York law governing the attorney-client privilege is generally similar to accepted federal doctrine, albeit with certain variants ..." *Bowne*, 150 F.R.D. at 470; *see also Niesig v. Team I*, 149 A.D.2d 94, 101, 545 N.Y.S.2d 153, 156–57, *aff'd*, 558 N.E.2d 1030, 76 N.Y.2d 363, 559 N.Y.S.2d 493 (1990).

The decisions of the Second Circuit and of the New York Court of Appeals explicitly place upon the party invoking the protection of a privilege the burden of proving the facts upon which the claim is based. *See e.g., United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir.1991); *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (1987); *Matter of Jacqueline F.*, 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 887, 391 N.E.2d 967 (1979). Local Rule 26.2 requires that "[w]here a claim of privilege is asserted in objecting to any means of discovery or disclosure, ... the attorney asserting the privilege ... [must] identify the nature of the privilege (including work product) which is being claimed." Local Rule 26.2(a). This information must "be furnished in writing at the time of the response to such discovery ..., unless otherwise ordered by the Court." Local Rule 26.2(c). The requirement of specifying the privilege asserted in a log is more than a mere "hypertechnicality" but rather is of great importance. *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y.1990) (upholding finding of magistrate judge that plaintiff waived any work product immunity because it violated Local Rule 46(e), predecessor to Local Rule 26.2, by submitting a privileged document list that merely made the prophylactic assertion of "privilege" as to the documents withheld). Indeed, failure to satisfy Local Rule 26.2 "will be considered presumptive evidence that the claim of privilege is without factual and legal foundation" and any privilege or immunity asserted over the documents is waived. *Allstate Life Ins. Co. v. First Trust Nat'l Ass'n*, 1993 WL 138844 at *2 (S.D.N.Y. April 23, 1993) (quoting *Grossman v. Schwarz*, 125 F.R.D. 376, 386–87 (S.D.N.Y.1989)).

The Privilege Log furnished by BankBoston fails to identify the nature of the privilege being claimed, and is thus insufficient. Despite his continued claim of privilege now that the documents are in his possession, Shamis has failed to rectify this deficiency.

Moreover, to the extent that Shamis and Bank Boston seemingly assert the "common interest" doctrine with respect to the withheld documents, their reliance on that rule is misplaced. The "common interest" rule is a limited exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party outside the attorney-client relationship. The "common interest" doctrine typically applies where multiple persons are represented by the same party— "join representation—and accordingly both clients are working together with a single attorney toward a common goal." *International Ins. Co. v. Newmont Mining Corp.,* 800 F.Supp. 1195, 1196 (S.D.N.Y.1992). The weight of authority suggests that the "common interest" rule can apply where parties are represented by separate counsel that engage in a common legal enterprise. *See United States v. Schwimmer,* 892 F.2d 237, 243–44 (2d Cir.1989). This version of the "common interest" doctrine has been described as follows:

> A community of interest exists among different persons or separate corporations where they have an identical legal interest.... The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

*North River Ins. Co. v. Columbia Cas. Co.,* 1995 WL 5792 at *3 (S.D.N.Y. January 5, 1995) (quoting *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C. 1974)). "What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal." *Id.* at *4.

Although Shamis and BankBoston would both benefit from a judgment in favor of the plaintiff, they do not share identical legal interests. Indeed, sharing a desire to succeed in an action does not create a "common interest". *See International Ins. Co.,* 800 F.Supp. at 1196. Shamis has not produced any agreement between plaintiff and his counsel and BankBoston establishing a joint prosecution of plaintiff's claims. There is no evidence of a coordinated legal strategy between Shamis and BankBoston. BankBoston is not, and has never been a party to this action. BankBoston has not exercised control over the conduct of this action, nor has it contributed to Shamis' legal expenses. *See North River Ins. Co.,* 1995 WL 5792 at *5 ("common interest" doctrine did not apply because the parties were not represented by same counsel; one party did not contribute to the other's legal expenses, nor exercise control over the conduct of the legal proceedings; and no evidence was presented of a coordinated legal strategy).

Accordingly, the BankBoston documents are not privileged, and must be produced.

### 5. *The Interrogatories*

On January 16, 1997, Ambassador served its second set of interrogatories (the "Interrogatories") to plaintiff. On February 25, 1997, Shamis responded, objecting to each and every interrogatory. Besides objecting to relevance, form and overbreadth, Shamis objected that the Interrogatories were "not a more practical method of obtaining the information under [then] Local Rule 46(b)."[8] Shamis maintains that document requests and depositions were a more practical way of obtaining the information sought by the Interrogatories.

Ambassador asserts that it propounded the Interrogatories precisely because Shamis failed to produce requested documents and was unable to provide any meaningful information at his deposition. Ambassador requests that the Court direct plaintiff to respond to Interrogatories 7, 8, 9, 15, 19 and 20.

Interrogatories 7 and 8 seek information concerning individuals and entities who acted

---

8. Now, Local Rule 33.3(b) which provides that discovery may be accomplished through interrogatories seeking information other than that provided in Rule 33(a), if "they are a more practical method of obtaining the information sought that a request for production or a deposition."

on behalf of the Official and Provisional Receivers.[9] They seek identification of witnesses who may have knowledge of (i) the winding up of the assets of Wishbone; (ii) substantial transactions between/among Wishbone, entities related to Wishbone, and entities related to Shamis; (iii) action taken by Shamis in the final years of Wishbone's existence which impacted the viability of Wishbone; and (iv) relevant records of Wishbone which plaintiff permitted to be destroyed (and whether any remaining records exist). Because the Interrogatories seek the identity of potential witnesses, these Interrogatories are proper under Local Rule 33.3.

Interrogatories 15 and 18 relate directly to Shamis' damage claim.[10] Interrogatory 18 specifically seeks information concerning the calculation of damages and is this within the express purview of Local Rule 33.3(a).

Interrogatories 19 and 20 seek information relating to documents produced in this case.[11] Although Interrogatories 19 and 20 seek information outside of the purview of Local Rule 33.3(a), they nevertheless are proper because they are arguably the most practical method of obtaining this information. The information requested by Ambassador relates to documents originally located in Hong Kong. The difficulties Ambassador would face in determining the circumstances surrounding these documents and their belated production are significant, while plaintiff should be able to obtain information concerning documents that he and his counsel produced.

Accordingly, Shamis will respond to Interrogatories 7, 8, 9, 15, 19 and 20. Further, Shamis is advised that an assertion of lack of knowledge is not a sufficient response to an interrogatory. *See Hansel v. Shell Oil Corp.,* 169 F.R.D. 303, 305 (E.D.Pa.1996) ("If a party is unable to supply the requested information, the party may not simply refuse to answer, but must state under oath that he is unable to provide the information and set forth the efforts he used to obtain the information"). "A party cannot plead ignorance to information that is from sources within its control." *Transcontinental Fertilizer Co. v. Samsung Co. Ltd.,* 108 F.R.D. 650, 653 (E.D.Pa.1985). Indeed, a party is "charged with knowledge of what its agents know and the contents of its available records." *American Rockwool, Inc. v. Owens–Corning Fiberglas Corp.,* 109 F.R.D. 263, 266 (E.D.N.C. 1985). Shamis is also advised that it is unacceptable to respond to an interrogatory by directing the interrogating party to deposition transcripts and documents without identifying the specific document and indicating the page and paragraphs that are responsive.

9. *INTERROGATORY NO. 7*
Identify each and every person or entity acting as, or that has ever acted as or on behalf of the Official Receiver.
*INTERROGATORY NO. 8*
Identify each and every person or entity acting as, or that has ever acted as or on behalf of the Unofficial Receiver.

10. *INTERROGATORY NO. 15*
Identify each and every bank or other financial institution to which Wishbone is currently in debt.
*INTERROGATORY NO. 18*
With respect to each category of damages alleged to have been incurred by plaintiff, set forth the basis for the calculation of damages in that category. Identify any and all documents that support and form the basis of this calculation.

11. *INTERROGATORY NO. 19*
Explain the circumstances surrounding the production of an additional approximately four hundred (400) pages of documents on the second day of Robert Shamis' Deposition. Include in that explanation:
Whether those documents were delivered to Storch Amini & Munves, P.C. from a source different than the documents bearing numbers 000001 to 002349 first produced by Robert Shamis; The source for the second approximately four hundred (400) pages of documents; and The reason for the delay in producing those documents.
*INTERROGATORY NO. 20*
Explain the circumstances surrounding the production of an additional approximately five hundred (500) pages of documents number 003096 to 003608 on or about January 3, 1997. Include in that explanation:
Whether those documents were delivered to Storch Amini & Munves, P.C. from a source different than the documents bearing numbers 00001 to 002349 and 002350 to 003095 produced by Robert Shamis;
The source for the documents number 00396 to 003608; and
The reason for the delay in producing those documents.

*See In re Savitt/Adler Litig.*, 176 F.R.D. 44, 49 (N.D.N.Y.1997).

## II. *The Roberts Defendants' Motion for Summary Judgment is Denied as to Korman and Granted as to Christy*

### A. *Standard for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ...' show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Silver v. City University*, 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir .1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). If there is any evidence in the record regarding the issues on which summary judgment is sought from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Knowles v. New York City Dept. of Corrections*, 904 F.Supp. 217, 220 (S.D.N.Y.1995).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

### B. *The Action is Dismissed as Against Angela*

Shamis does not oppose the motion for summary judgment in favor of Angela and advises the Court that "he agrees to dismiss Angela from the litigation." (Plaintiff's Brief at 3). Thus, the action is dismissed as against Angela.

### C. *The Motion for Summary Judgment as to Korman is Denied*

Plaintiff's Sixth Claim for Relief names Korman, along with Roberts and Mahoney Cohen, and charges all three with fraud. Shamis alleges that "upon information and belief, Roberts—through its principals, including Korman—engaged in the practice of 'pre-invoicing' goods both prior to and after the termination of their relationship with Wishbone." Shamis further contends that "Roberts—through Korman and Mahoney— purposefully concealed from Wishbone its regular business practice of issuing fraudulent invoices, throughout the negotiation of and performance under the Master Agreement and Assignment of Factoring Proceeds, and that Roberts—also through Korman— misrepresented to Wishbone the amounts of Roberts' actual receivables and unsold inventory, and concealed from Wishbone that Roberts' inventory derived from Wishbone had been diverted to Jay Vee."

Plaintiff's Second Amended Complaint characterizes two types of fraudulent invoicing. Shamis defines "phony invoicing" as submitting to a factor an invoice that does not reflect an actual order placed by a customer. He defines "pre-invoicing" as submitting an invoice which does not reflect an actual customer order, yet which are submitted before the ordered shipment is shipped or delivered to the customer who placed the order.

According to Shamis, from late 1989 through January 1992, Korman made, and participated in making of material false statements of fact with respect to: (1) the amount of sales that Roberts was making; (2) the amount of inventory which Roberts had on hand; and (3) the accounts receivable. Shamis avers that in July 1991, Korman made, and participated in the making of

fraudulent statements as to Roberts being an ongoing business concern. According to Shamis, at the time that Korman made and/or caused to be made, these statements, Roberts had actually fraudulently transferred its inventory to another entity controlled by Korman, Jay Vee, for no consideration.

Shamis contends that Wishbone relied upon the representations of Korman, and other such representations made with the authorization and direction of Korman, in extending credit to Roberts, and in refraining from foreclosing on Wishbone's security interest. As a result, Shamis maintains that Wishbone suffered damages of not less than $34 million in Hong Kong dollars.

■■■ To prevail on a fraud claim under New York law, Shamis must show: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 584 (S.D.N.Y.1995).

Additionally, in a diversity action alleging fraud, the plaintiff must comply with the heightened pleading standard of Rule 9(b), Fed.R.Civ.P., which requires that the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from

harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See Di Vittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse*, 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd*, 936 F.2d 674 (2d Cir. 1991).

■■■ Defendants contend, in essence, that the Second Amended Complaint fails to satisfy the pleading requirements of Rule 9(b). However, plaintiff's allegations of Korman's involvement in the alleged fraud are specific as to the time, the place, and the nature of the fraudulent activity. Accordingly, Shamis has plead the circumstances of the alleged fraud with particularity. *See Cadillac v. Cadillac*, 58 F.R.D. 534, 535 (E.D.N.Y. 1973).[12]

■■■ Shamis has also adequately plead scienter. Rule 9(b) states that scienter may be averred generally. Although mere conclusory allegations are insufficient, a strong inference of fraudulent intent can be established either by alleging facts showing a motive and clear opportunity for committing fraud or, "[w]here motive is not apparent, … by identifying circumstances indicating conscious behavior by the defendant." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987).

■■■ Shamis alleges that Korman had the opportunity to deceive Wishbone as Korman had knowledge of all the material facts, and was perfectly positioned to misrepresent those facts to Wishbone. Conscious behavior, too, is clear from the face of the Second Amended Complaint. Shamis alleges that Korman knowingly and deliberately conveyed false information about Roberts' financial condition to Wishbone, and presented bogus projections to Wishbone, thereby convincing it to forego foreclosure on Roberts' inventory. Shamis has, thus, alleged scienter with sufficient particularity.[13]

**12.** The Roberts Defendants cite *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1124 (S.D.N.Y.1982) for the proposition that plaintiff is required to identify the particular representations that he contends were false. In fact, *Gibbons* states that "a plaintiff claiming fraud must allege facts stating the time, place and *nature of* the misrepresentations or omissions for which

each defendant is to be held responsible." *Id.* (emphasis added). Plaintiff has satisfied this burden.

**13.** Shamis has also adequately alleged reliance and damages.

Shamis avers that Korman was in the "middle of crucial decisions and representations constituting the fraud." Storch Supp. Aff. ¶ 14. The Roberts Defendants maintain that Korman was simply a dress stylist and was not involved in the financial affairs of Roberts or any of the other corporate entities. According to the Roberts Defendants, "the responsibilities, which go to the heart of plaintiff's unsupported fraud claim (invoicing, shipping, factoring and maintaining of inventory), were not the province of Korman." Olitt Supp.Aff. ¶ 21. Thus, there remain disputed issues of material fact as to (1) whether Korman actively directed the fraudulent billing practices at issue; (2) whether Korman repeatedly participated in the dissemination of false information showing sales that had not taken place; (3) whether Korman repeatedly misrepresented to Shamis and others at Wishbone the financial status of Roberts; and (4) whether Korman actively participated in a fraudulent conveyance of Roberts inventory to Jay Vee in order to avoid Wishbone's security interest. Accordingly, summary judgment as to Korman on plaintiff's fraud claim is inappropriate.

## D. *The Motion for Summary Judgment as to Christy is Denied in Part and Granted in Part*

### 1. *Successor Liability*

Plaintiff's Seventh Claim alleges that Christy is a corporate successor to Roberts; that Roberts assigned to Christy, without adequate consideration, a portion of its assets, stock and/or business; that there has been a co-mingling of Roberts' inventory with Christy's inventory, including inventory in which Wishbone purportedly holds a security interest; and that Roberts transferred business to Christy in an transaction tantamount to a consolidation and/or merger. (Second Amended Complaint ¶¶ 128, 129, 132).

A corporation that purchases the assets of another entity normally is liable under New York law for the debts and liabilities of the seller only in certain exceptional circumstances:

> A corporation may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuance of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.

*Schumacher v. Richards Shear Co., Inc.,* 451 N.E.2d 195, 198, 59 N.Y.2d 239, 245, 464 N.Y.S.2d 437, 440.

Based upon the Second Amended Complaint, Shamis seems to contend that Christy should be held to be Robert's successor under the second, third and fourth exceptions.[14]

### a. *Consolidation or Merger*

A successor corporation is liable for the debts and liabilities of its predecessor where there is a merger or consolidation of the two firms. The Second Circuit has held:

> [T]o find that a de facto merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation, and the assumption of liabilities by the Purchaser.

*Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,* 775 F.2d 38, 42 (2d Cir.1985) (quoting *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 838 (S.D.N.Y.1977)).

The "continuity of ownership" factor looks to whether shareholders of the predecessor become, at the time of the sale of the assets, shareholders of the successors corporation. *See Diaz v. South Bend Lathe Inc.,* 707 F.Supp. 97 (E.D.N.Y.1989); *Arnold Graphics,* 775 F.2d at 42. The parties do not dispute that Roberts was owned by Leonard Kaye and Stephanie Robbins. Neither Korman nor his wife, Angela Korman, had an

---

14. It is unclear from Shamis' motion papers upon what theory his claim of successor liability is based.

ownership interest in Roberts. Christy was capitalized through an investment made by Angela Korman, with funds she acquired through a loan obtained from a financial institution. Angela Korman is and has been sole shareholder of Christy. Thus, the continuity of stockholders required for a finding of a de facto merger is not present here.

There is also no continuity of physical location. While Roberts maintained its place of business at 1400 Broadway, New York, New York, Christy maintained and continues to maintain its business at 1001 Sixth Avenue, New York, New York. As to continuity of assets, Shamis presents no evidence that any assets, stock, inventory or business of Roberts was transferred to Christy.

While Shamis notes that Korman, Gerald Werbin and Vincent Cacesse Jr. were each employed with Roberts and Christy, he does not account for the other twenty-seven employees formerly employed by Roberts. Moreover, the fact that two corporations have an identity of members or officers does not necessarily suggest that the corporations do not have a separate identity. *See Ladjevardian*, 431 F.Supp. at 838–39.

Shamis' allegation of a de facto merger also fails the "dissolution test." Roberts was not dissolved until September 24, 1997, nearly four years after Christy was incorporated. While Roberts had ceased doing business by the time Christy was incorporated, the "dissolution test" is to be strictly applied even if the purported predecessor corporation exists only as a "virtually empty shell." *Marenyi v. Packard Press Corporation*, 1994 WL 533275 at *2–3 (S.D.N.Y. September 30, 1994).

### b. *"Mere Continuance"*

"Successor liability attaches to a corporation as a 'mere continuance' only when 'one corporation survives the transaction; the predecessor corporation must be extinguished.'" *Schumacher*, 451 N.E.2d at 198, 59 N.Y.2d at 245, 464 N.Y.S.2d at 440. Shamis acknowledges that Roberts continued to exist until September 24, 1997, nearly four years after the incorporation of Christy.

A continuance envisions a "common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer ... What it accomplishes is something in the nature of a corporate reorganization, rather than a mere sale." *Ladjevardian*, 431 F.Supp. at 839. It is not simply the business of the alleged predecessor that continues, but the corporate entity itself. Thus, Christy cannot be considered a mere continuation of Roberts.

### c. *Fraudulent Transfer*

■ The last of the four exceptions to the general rule against successor liability provides that the purchaser of a corporation's assets may be liable for claims against the seller when "the transaction was entered into fraudulently to escape such obligations." *Schumacher*, 451 N.E.2d at 198, 59 N.Y.2d at 245, 464 N.Y.S.2d at 440. Shamis claims that Roberts conveyed the inventory it had acquired from Wishbone for no consideration and with the intent to defraud Wishbone as a secured creditor. (Second Amended Complaint ¶¶ 136–37).[15]

■ Under New York law governing fraudulent conveyances, a transaction is not fraudulent if it is both an exchange for equivalent value and made in good faith. *See Computerland Corp. v. Batac, Inc.*, 750 F.Supp. 97, 98 (S.D.N.Y.1990).

> [A] transaction is void for lack of good faith when "one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay or defraud others. The term 'good faith' does not merely mean the opposite of the phrase 'actual intent to defraud.'"

*Id.*, (quoting *Southern Industries, Inc. v. Jeremias*, 66 A.D.2d 178, 182, 411 N.Y.S.2d 945, 949 (1978)).

Shamis offers no evidence to support his claim of fraudulent transfer. He cannot point to specific inventory that Roberts ac-

---

15. Plaintiff makes this allegation in his Eighth Claim for Relief.

quired from Wishbone and conveyed to Christy either for or without adequate consideration. He submits no proof that Christy acquired any Roberts inventory, let alone inventory in which Wishbone held a security interest. Shamis has testified that he does not know how much inventory was supposedly conveyed by Roberts or when this transfer ostensibly occurred. (Shamis Tr. at 553, 547). Upon being asked whether Roberts' inventory was fraudulently conveyed to Christy and other corporations, Shamis responded that he "believe[s] that it is very possible that is what happened with some of the inventory." (Shamis Tr. at 552–53). Shamis has not established a conveyance from Roberts to Christy, let alone a fraudulent one. Accordingly, summary judgment is appropriate. *See Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.").

As Shamis has not established that Christy is a mere continuance of Roberts, nor a de facto merger between Roberts and Christy, nor a fraudulent transfer, Shamis' claim that Christy is a successor of Roberts must fail.

### 2. *"Alter Egos" and Piercing the Corporate Veil*

Although this allegation is not specifically pled, the factual allegations contained in the Second Amended Complaint may support the maintenance of a claim based on an alter ego theory of liability. Shamis maintains that Christy, Roberts and Jay Vee are "alter egos." According to Shamis, Roberts, Jay Vee and Christy were "inextricably intertwined for the purpose of defrauding creditors." (Plaintiff's Brief at 19) Shamis asserts that Korman is "in direct control of Christy," and that "all business decisions made by S. Roberts right down to Christy are controlled by Korman." (Plaintiff's Brief at 19).

■ In order to state a claim under an alter ego theory of liability, Shamis must establish: (1) that Korman exercised such complete control that the other defendants had no separate will of their own; and (2) that this domination was used to commit a wrong against Shamis which proximately caused his injuries. *See American Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988); *Zinaman v. USTS New York, Inc.,* 798 F.Supp. 128, 132 (S.D.N.Y.1992). In *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* the Second Circuit set forth ten non-exclusive factors to be considered when determining whether corporations should be treated as alter egos:

(1) the absence of the formalities and paraphernalia that are part and parcel of corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

933 F.2d 131, 139 (2d Cir.1991). Consideration of these factors is a fact specific inquiry that necessarily "differs with the circumstances of each case." *American Protein,* 844 F.2d at 60 (citation omitted).

■ Shamis alleges that Korman treated Roberts and Jay Vee as "his own piggy bank." (Plaintiff's Brief at 19). Shamis points to documents produced by Mahoney Cohen showing unpaid "loans and exchanges" of more than $150,000 to Korman in 1990, and over $732,000 to Korman in 1991, the same year in which Roberts ceased doing business. Shamis also points copies of American Express bills reflecting Korman's purchases of various personal items, such as mattresses, baby clothing, women's shoes,

jewelry and tobacconist products, addressed to Korman, in care of Roberts but paid for by Jay Vee.

Shamis avers that there is overlap in ownership, officers, directors and personnel between Roberts, Jay Vee and Christy. He asserts that the "core group of control persons moved as a group from one entity to the next as creditors bore down on them." (Plaintiff's Brief at 19). Shamis alleges that while Angela Korman purports to be the sole owner, director, and shareholder of Christy, she knows "virtually nothing" about the business. According to Shamis, it is Korman who is in direct control of Christy.

Defendants contend that Shamis has not established that Korman dominated Roberts and assert that Korman was not an owner of Roberts. However, New York courts have recognized for veil piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over a corporation may be deemed an "equitable owner," notwithstanding the fact that the individual is not a shareholder of the corporation. *See Freeman v. Complex Computing Company, Inc.*, 119 F.3d 1044, 1051 (2d Cir.1997); *Guilder v. Corinth Constr. Corp.*, 235 A.D.2d 619, 651 N.Y.S.2d 706 (1997) ("Even if the [principals] were not the [corporation]'s legal owners, it is apparent that they dominated an controlled the corporation to such an extent that they may be considered its equitable owners.") As the Appellate Division explained in *Lally v. Catskill Airways, Inc.*, a nonshareholder defendant may be, "in reality," the equitable owner of a corporation where the nonshareholder defendant "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute." 198 A.D.2d 643, 603 N.Y.S.2d 619, 621 (1993).

There remain disputed issues of fact as to Korman's control over Roberts and Christy, and whether he may be considered an equitable owner. Accordingly, summary judgment on the claim of alter ego liability as to Christy is inappropriate.

### 3. *Fraudulent Transfer*

Shamis alleges that "Roberts conveyed to Christy the inventory that it acquired from Wishbone for no fair consideration and with the specific intent to remove that inventory and other assets from the possibility of foreclosure or enforcement by Wishbone and other creditors." (Second Amended Complaint ¶ 136). As noted, under New York law governing fraudulent conveyances, a transaction is not fraudulent if it is both an exchange for equivalent value and made in good faith. *See Computerland Corp. v. Batac, Inc.*, 750 F.Supp. 97, 98 (S.D.N.Y.1990). As the foregoing discussion with respect to Shamis' Successor Liability Claim demonstrates, Shamis fails present any evidence of a fraudulent transfer between Roberts and Christy. Moreover, Shamis offers no opposition in his papers to summary judgment in favor of Christy on the fraudulent transfer claim. Thus, summary judgment is granted as to Shamis' claim of fraudulent transfer against Christy. *See Goenaga*, 51 F.3d 14.

### *Conclusion*

For the reasons set forth above, Defendants' motion to dismiss is denied. The Roberts Defendants' motion for summary judgment is granted in part and denied in part.

It is so ordered.